STATE OF CONNECTICUT *v.* SCOTT SALAMON
(SC 17610)

Borden, Norcott, Katz, Palmer, Vertefeuille, Zarella and Sullivan, Js.*

the contribution of each of the parties in the acquisition . . . of their respective estates." General Statutes § 46b-81 (c).

 * The listing of justices reflects their seniority status as of the date of oral argument.

510

Argued April 17, 2007—officially released July 1, 2008

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, *Timothy J. Sugrue*, senior assistant state's attorney, and *Michael Colombo*, former deputy assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Scott Salamon, guilty of one count each of the crimes of kidnapping in the second degree in violation of General Statutes § 53a-94,[1] unlawful restraint in the first degree

---

[1] General Statutes § 53a-94 provides in relevant part: "(a) A person is guilty of kidnapping in the second degree when he abducts another person. . . ."

" 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2).

" 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein, 'without consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement." General Statutes § 53a-91 (1).

in violation of General Statutes § 53a-95,[2] and risk of injury to a child in violation of General Statutes (Rev. to 2001) § 53-21 (a) (1).[3] The trial court rendered judgment in accordance with the jury verdict,[4] and the defendant appealed.[5] On appeal, the defendant raises several claims. With respect to his conviction of kidnapping in the second degree, the defendant urges us to revisit and overrule our interpretation of this state's kidnapping statutes, most recently articulated by this court in *State* v. *Luurtsema*, 262 Conn. 179, 811 A.2d 223 (2002), under which a person who restrains another person with the intent to prevent that person's liberation may be convicted of kidnapping even though the restraint involved in the kidnapping is merely incidental to the commission of another offense perpetrated against the victim by the accused.[6] See id., 202. With respect to his conviction of unlawful restraint in the first degree, the defen-

[2] General Statutes § 53a-95 provides in relevant part: "(a) A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury. . . ."

[3] General Statutes (Rev. to 2001) § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

[4] The trial court sentenced the defendant to fifteen years imprisonment, suspended after eight years, and five years probation for the conviction of kidnapping in the second degree, three years imprisonment for the conviction of unlawful restraint in the first degree, and three years imprisonment for the conviction of risk of injury to a child. All sentences were to run concurrently.

[5] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] In *Luurtsema*, we rejected a claim identical in all material respects to the claim that the defendant raises in the present case, namely, that a defendant may not be convicted of the crime of kidnapping when the restraint used in the commission of that offense is merely incidental to the commission of the crime of sexual assault. See *State* v. *Luurtsema*, supra, 262 Conn. 200, 202. This court first rejected a similar claim in *State* v.

dant challenges the propriety of the trial court's jury instructions on the element of intent. Finally, the defendant claims that he is entitled to a new trial on all three counts on the basis of certain prosecutorial improprieties that had occurred during the trial. We accept the defendant's invitation to reconsider our prior interpretation of the kidnapping statutes and now conclude that that interpretation was incorrect and must be overruled. Because the trial court instructed the jury in accordance with this court's then applicable precedent governing the interpretation of those statutes, we reverse the defendant's conviction of kidnapping in the second degree and remand the case for a new trial on that charge.[7] We disagree, however, with the defendant's other claims and, therefore, affirm the defendant's conviction of unlawful restraint in the first degree and risk of injury to a child.

The jury reasonably could have found the following facts. In the summer of 2002, the victim, a fifteen year old female,[8] was visiting her aunt and uncle in Tuckahoe, New York. On July 3, 2002, the victim's aunt drove

---

*Chetcuti*, 173 Conn. 165, 170–71, 377 A.2d 263 (1977). Following our decision in *Chetcuti* in 1977, however, we used language in several cases suggesting that a kidnapping conviction could not stand when the restraint at issue was incidental to another crime. See, e.g., *State* v. *Bell*, 188 Conn. 406, 416, 450 A.2d 356 (1982) (whether restraint used in any given case is sufficient to constitute kidnapping, or is merely incidental to another crime, ordinarily raises question for jury); *State* v. *Lee*, 177 Conn. 335, 343, 417 A.2d 354 (1979) (same). Subsequently, in *State* v. *Vass*, 191 Conn. 604, 469 A.2d 767 (1983), we clarified our prior cases, explaining that "the question for the jury to decide is *not* whether the kidnapping was incidental to [another crime] but whether the evidence of intent to restrain is sufficient to support convictions for the two distinct offenses arising out of a single act." (Emphasis added.) Id., 616 n.9.

[7] The defendant claims that, under the construction of the kidnapping statutes that we adopt in the present case, he is entitled to a judgment of acquittal on the kidnapping count. For the reasons that we set forth in part I of this opinion, we conclude that the defendant is entitled to a new trial on the kidnapping count, not a judgment of acquittal on that count.

[8] In accordance with our policy of protecting the privacy interests of the victims of certain crimes, including risk of injury to a child, we decline to

her to Bronx, New York, to visit with other relatives. The following evening, the victim boarded a train in New York, intending to return to the Tuckahoe residence of her aunt and uncle. While on the train, the victim fell asleep. When she awoke sometime between 9:30 and 10 p.m., she realized that she was in Connecticut and that she apparently had taken the wrong train. The victim disembarked the train in Stamford and began walking toward a stairwell in the direction of the main concourse. At that time, the victim noticed the defendant, who was watching her from a nearby platform. As the victim approached the stairwell, she observed that the defendant was following her. The defendant continued to follow the victim as she ascended the stairs. Before the victim reached the top of the stairs, the defendant caught up to her and grabbed her on the back of the neck, causing her to fall onto the steps. The victim, who had injured her elbow as a result of the fall, attempted to get up, but the defendant, who had positioned himself on the steps beside her, was holding her down by her hair. The victim screamed at the defendant to let her go. The defendant then punched the victim once in the mouth and attempted to thrust his fingers down her throat as she was screaming. Eventually, the victim was able to free herself from the defendant's grasp, and the defendant fled. Security personnel were summoned, and, shortly thereafter, the defendant was apprehended and arrested. At the time, the victim told a security guard that she thought that the defendant had been trying to rape her; later, however, the victim indicated that she did not know why the defendant had accosted her. According to the victim, the altercation with the defendant lasted at least five minutes.

The defendant initially was charged with various offenses, including unlawful restraint in the first degree,

---

identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

risk of injury to a child and assault in the third degree.[9] At the beginning of jury selection, however, the state filed an amended information charging the defendant with one count each of kidnapping in the second degree, risk of injury to a child, attempted sexual assault in the third degree and unlawful restraint in the first degree, and three counts of assault in the third degree. Immediately preceding the commencement of the evidentiary portion of the trial, however, the state filed a substitute information charging the defendant with kidnapping in the second degree, unlawful restraint in the first degree and risk of injury to a child. In a pretrial motion to dismiss, the defendant asserted that there was an inadequate factual basis for the charge of kidnapping in the second degree. The defendant renewed this claim in a motion for judgment of acquittal, which he filed at the conclusion of the evidentiary portion of the trial. In each of these motions, the defendant claimed that he had been overcharged for conduct that, in essence, constituted third degree assault. The trial court denied both of the defendant's motions. In addition, the defendant requested that the court instruct the jury that, if it found that the restraint involved in the alleged kidnapping was incidental to the defendant's assault of the victim, then it was required to find the defendant not guilty of kidnapping in the second degree. The trial court did not give the requested jury instruction. The jury ultimately found the defendant guilty as charged.

On appeal, the defendant claims that his conviction of kidnapping in the second degree must be reversed because, contrary to controlling precedent, the jury should have been instructed to find the defendant not guilty of that charge if it first found that the defendant's restraint of the victim in connection with the kidnapping was incidental to the defendant's restraint of the victim

---

[9] In the state's original information, the defendant also was charged with breach of the peace in the second degree and interfering with an officer.

in connection with his assault of the victim. The defendant also maintains that he was deprived of his due process right to a fair trial as a result of certain improper conduct by the deputy assistant state's attorney during the trial and that the trial court improperly instructed the jury on the intent element of the offense of unlawful restraint in the first degree. We agree with the defendant's first claim but disagree with his other two claims.

I

The defendant maintains that our construction of this state's kidnapping statutes has been overly broad, thereby resulting in kidnapping convictions for conduct that the legislature did not contemplate would provide the basis for such convictions. He claims that the legislature did not intend for the enhanced penalties available upon conviction of kidnapping[10] to apply when the restraint involved in the kidnapping is incidental to the

[10] The crime of kidnapping generally carries more severe penalties than the crimes of assault, sexual assault and robbery. For example, kidnapping in the first degree is a class A felony that is punishable by a term of imprisonment of not less than ten years and not more than twenty-five years; see General Statutes §§ 53a-92 (b) and 53a-35a; whereas assault in the first degree, robbery in the first degree, and most offenses of sexual assault in the first degree are class B felonies that are punishable by a maximum term of imprisonment of twenty years. See General Statutes §§ 53a-59 (b), 53a-70 (b), 53a-134 (b) and 53a-35a. Similarly, the crime of kidnapping in the second degree is a class B felony that is punishable by a term of imprisonment of not more than twenty years; see General Statutes §§ 53a-94 (b) and 53a-35a; whereas robbery in the second degree and most offenses of sexual assault in the second degree are class C felonies that are punishable by a maximum term of imprisonment of ten years; see General Statutes §§ 53a-71 (b), 53a-135 (b) and 53a-35a; and assault in the second degree is a class D felony that is punishable by a maximum term of five years imprisonment. See General Statutes §§ 53a-60 (b) and 53a-35a. Moreover, under our current interpretation of the kidnapping statutes, conduct that is sufficient to form the basis of a conviction for a particular degree of assault, sexual assault or robbery also may form the basis of a conviction for a higher degree of kidnapping. For example, under General Statutes § 53a-72a (a) (1) (A), a person is guilty of sexual assault in the third degree, generally a class D felony punishable by no more than five years imprisonment; see General Statutes § 53a-35a; when that person compels another person to submit to sexual contact by the use of force against such other person. The very same

commission of another crime or crimes. In support of his claims, the defendant contends: (1) the evolution of the common law predating our kidnapping statutes indicates that a narrower construction is warranted; (2) our prior decisions construing the kidnapping statutes appeared to recognize the propriety of that narrow interpretation, but we subsequently expanded the scope of the offense, without sound reason for doing so, to reflect the literal language of the kidnapping statutes; see footnote 6 of this opinion; (3) our current approach leads to absurd and unconscionable results when the restraint that provides the basis of the kidnapping charge constitutes the same restraint that a defendant necessarily uses to commit the primary, underlying offense; and (4) a significant majority of our sister states have rejected that literalist approach and, instead, have interpreted their kidnapping statutes in accordance with the construction that the defendant urges us to adopt. In response, the state asserts that the defendant has failed to offer cogent reasons for overruling established precedent that permits a conviction for kidnapping when the restraint involved in the commission of that offense is merely incidental to the commission of a separate, underlying offense against the victim. After careful consideration of the competing claims, we are persuaded by the defendant's arguments.[11]

conduct that forms the basis of the conviction of sexual assault in the third degree—conduct that would *not* support a conviction of sexual assault of any greater degree—also could form the basis of a conviction for kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A); see footnote 19 of this opinion; a class A felony punishable by a prison term of not less than ten years and not more than twenty-five years. See General Statutes §§ 53a-92 (b) and 53a-35a.

[11] The defendant also raised two other claims with respect to his conviction of kidnapping in the second degree, neither of which we address in light of our determination that the defendant is entitled to a new trial on that charge. In particular, the defendant claims that (1) § 53a-94, as interpreted by this court, is unconstitutionally vague as applied to the facts of this case, and (2) the trial court improperly instructed the jury on the element of intent. We do not address the defendant's first claim because that claim implicates this court's prior interpretation of our kidnapping statutes, which

&middot; At the outset, we address the state's contention that we should not reexamine our prior holdings concerning the construction of this state's kidnapping statutes. In support of its claim, the state relies primarily on two separate but related principles, namely, the doctrine of stare decisis and the tenet of statutory interpretation that counsels against overruling case law involving our construction of a statute if the legislature reasonably may be deemed to have acquiesced in that construction. Although we recognize that both of these principles implicate important policy considerations that should not be set aside lightly, we are persuaded that the doctrines are not sufficiently weighty to bar reconsideration of our prior precedent interpreting the kidnapping statutes.

"This court has repeatedly acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law." *Conway* v. *Wilton*, 238 Conn. 653, 658, 680 A.2d 242 (1996). "The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and . . . is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Internal quotation marks omitted.) *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494, 923 A.2d 657 (2007).

Moreover, "[i]n evaluating the force of stare decisis, our case law dictates that we should be especially wary

we overrule in the present case, and not the interpretation that we adopt in its stead. We do not consider the defendant's second claim because it is not likely to arise on retrial.

of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided. . . . More often, however, the legislature takes no further action to clarify its intentions. Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) Id., 494–95.

None of the foregoing principles, however, necessarily constitutes an insurmountable barrier to a court's reconsideration of its prior precedent. With respect to the doctrine of stare decisis, we repeatedly have observed that "[t]he value of adhering to [past] precedent is not an end in and of itself . . . if the precedent reflects substantive injustice. Consistency must also serve a justice related end. . . . When a previous decision clearly creates injustice, the court should seriously consider whether the goals of stare decisis are outweighed, rather than dictated, by the prudential and pragmatic considerations that inform the doctrine to enforce a clearly erroneous decision. . . . The court must weigh [the] benefits of [stare decisis] against its burdens in deciding whether to overturn a precedent it thinks is unjust. . . . It is more important that the

court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations. . . . In short, consistency must not be the only reason for deciding a case in a particular way, if to do so would be unjust. Consistency obtains its value best when it promotes a just decision." (Citations omitted; internal quotation marks omitted.) *State* v. *Miranda*, 274 Conn. 727, 734, 878 A.2d 1118 (2005). Moreover, "[e]xperience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better. . . . Indeed, [i]f law is to have current relevance, courts must have and exert the capacity to change a rule of law when reason so requires. . . . [Thus] [t]his court . . . has recognized many times that there are exceptions to the rule of stare decisis." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 691, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); see also *Payne* v. *Tennessee*, 501 U.S. 808, 828, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) ("[s]tare decisis is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision" [internal quotation marks omitted]). In accordance with these principles, we have not hesitated to revisit and overrule our prior holdings, including prior holdings applicable to criminal matters; see, e.g., *State* v. *Skakel*, supra, 693; *State* v. *Miranda*, supra, 733–34; *State* v. *Colon*, 257 Conn. 587, 601–602, 778 A.2d 875 (2001); once we are convinced that they were incorrect and unjust.

We also have recognized that "legislative inaction [following our interpretation of a statute] is not necessarily legislative affirmation . . . ." (Internal quotation marks omitted.) *State* v. *Colon*, supra, 257 Conn. 598 n.14; accord *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 252, 756 A.2d 1264 (2000). Indeed, we recently have observed that the legislature's failure to

amend a statute in response to our interpretation of that provision is not dispositive of the issue because legislative inaction is not always "the best of guides to legislative intent." (Internal quotation marks omitted.) *State* v. *Colon,* supra, 598 n.14; see also *Streitweiser* v. *Middlesex Mutual Assurance Co.,* 219 Conn. 371, 379, 593 A.2d 498 (1991). Thus, despite our reluctance to overrule cases involving the construction of statutes, we occasionally have done so, "even when the legislature has had numerous occasions to reconsider [our] interpretation and has failed to do so." *Conway* v. *Wilton,* supra, 238 Conn. 662; see, e.g., *Waterbury* v. *Washington,* 260 Conn. 506, 538–39, 800 A.2d 1102 (2002) (overruling prior cases concerning exhaustion doctrine as applied to Connecticut Environmental Protection Act); *Ferrigno* v. *Cromwell Development Associates,* 244 Conn. 189, 202, 708 A.2d 1371 (1998) (overruling prior interpretation of General Statutes § 37-9 [3] because that interpretation created irreconcilable conflict between civil and criminal provisions of usury law); *Santopietro* v. *New Haven,* 239 Conn. 207, 215, 682 A.2d 106 (1996) (concluding that our previous statutory interpretation of General Statutes § 52-228b was flawed); *Conway* v. *Wilton,* supra, 680–81 (overruling prior interpretation of General Statutes § 52-557f [3] as applied to municipalities). Indeed, in a number of recent cases, we have overruled our prior interpretation of a criminal statute. See, e.g., *State* v. *Skakel,* supra, 276 Conn. 666–67 (overruling prior case law affording prospective effect only to 1976 amendment to limitation period of General Statutes [Rev. to 1975] § 54-193); *State* v. *Miranda,* supra, 274 Conn. 733–34 (overruling this court's prior interpretation of General Statutes § 53a-59 [a] [3]); *State* v. *Colon,* supra, 589 (overruling this court's prior interpretation of General Statutes § 53a-48 [a]).

For several reasons, we are persuaded that it is appropriate to reexamine our interpretation of the kidnapping

statutes in accordance with the defendant's request. First, as this court previously has observed, "[t]he arguments for adherence to precedent are least compelling . . . when the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants . . . ." (Internal quotation marks omitted.) *Craig* v. *Driscoll*, 262 Conn. 312, 330, 813 A.2d 1003 (2003); accord *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 681, 855 A.2d 212 (2004). Persons who engage in criminal misconduct, like persons who engage in tortious conduct, "rarely if at all will . . . give thought to the question of what law would be applied to govern their conduct" if they were to be apprehended for their violations. (Internal quotation marks omitted.) *Conway* v. *Wilton*, supra, 238 Conn. 661. Applying this principle to the present case, we conclude that there is no reason to believe that anyone would attempt to tailor his or her criminal conduct in light of this court's interpretation of the interrelationship between our kidnapping statutes and other criminal statutes prohibiting the same or similar conduct.[12] Consequently, this lack of reliance militates in favor of the defendant's contention that we should revisit our interpretation of the kidnapping statutes.

Second, the issue presented by the defendant's claim is not one that is likely to have reached the top of the legislative agenda because the issue directly implicates only a relatively narrow category of criminal cases, that is, kidnapping cases in which the restraint involved is incidental to the commission of another crime. Moreover, in contrast to other matters that are subject to

[12] We do not suggest, of course, that our criminal laws do not serve the important function of general deterrence. We also do not dispute the notion that the public is entitled to fair notice of the conduct that is prohibited by our criminal laws. It is difficult to imagine, however, that a person, before committing an intentional assault, sexual assault or robbery, would stop to think about how to avoid *also* committing the crime of kidnapping.

legislative regulation, it is uncertain whether the position that the defendant advocates would attract interested sponsors with access to the legislature. Finally, to the extent that such potential sponsors do exist, it also is unclear whether the issue is sufficiently important to gain their full support.

Third, this court never has undertaken an extensive analysis of whether our kidnapping statutes warrant the broad construction that we have given them. Although we consistently have reaffirmed our existing construction of those statutes, our conclusion essentially has been limited to the general observation—predicated solely on the language of the kidnapping statutes—that the "legislature [has] not seen fit to merge the offense of kidnapping with other felonies, nor impose any time requirements for restraint, nor distance requirements for asportation, to the crime of kidnapping." (Internal quotation marks omitted.) *State* v. *Luurtsema*, supra, 262 Conn. 202; accord *State* v. *Wilcox*, 254 Conn. 441, 465, 758 A.2d 824 (2000); *State* v. *Amarillo*, 198 Conn. 285, 304–305, 503 A.2d 146 (1986); *State* v. *Lee*, 177 Conn. 335, 343, 417 A.2d 354 (1979); *State* v. *Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977). In view of the fact that the parties to the present appeal have thoroughly and thoughtfully briefed the issue, this case affords us the opportunity to conduct a more searching examination of the merits of that issue than we previously have undertaken.

A fourth, albeit related, reason to reconsider our prior holdings construing the kidnapping statutes to encompass virtually all sexual assaults and robberies is that all of our prior cases have relied on a literal application of the language of our kidnapping statutes. See, e.g., *State* v. *Luurtsema*, supra, 262 Conn. 201–202. Although we frequently adhere to the literal language of a statute, we are not bound to do so when it leads to unconscionable, anomalous or bizarre results. See, e.g., *Clark* v.

*Commissioner of Correction*, 281 Conn. 380, 400–401, 917 A.2d 1 (2007) (rejecting literal construction of statutory language because that construction would be inconsistent with legislative scheme governing same subject matter); *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 404–405, 780 A.2d 903 (2001) (rejecting literal construction of statute when that construction would result in inequitable and unintended consequences); *Levey Miller Maretz* v. *595 Corporate Circle*, 258 Conn. 121, 133, 780 A.2d 43 (2001) (declining to apply statutory language literally when to do so would lead to bizarre results); *State* v. *Brown*, 242 Conn. 389, 402, 699 A.2d 943 (1997) (declining to apply literal language of statute and rules of practice when that language could not be "applied sensibly in that fashion"). The fact that our adherence to the literal language of the kidnapping statutes arguably can lead to such a result is reason to revisit our prior interpretation.

Fifth, "the legislative acquiescence doctrine requires actual acquiescence on the part of the legislature. [Thus] [i]n most of our prior cases, we have employed the doctrine not simply because of legislative inaction, but because the legislature affirmatively amended the statute subsequent to a judicial or administrative interpretation, but chose not to amend the specific provision of the statute at issue." *Berkley* v. *Gavin*, 253 Conn. 761, 776–77 n.11, 756 A.2d 248 (2000). In other words, "[l]egislative concurrence is particularly strong [when] the legislature makes unrelated amendments in the same statute." (Internal quotation marks omitted.) *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 594, 698 A.2d 873 (1997) (*Berdon, J.*, dissenting). It is significant, therefore, that, with the exception of a 1993 amendment to § 53a-94 affecting only its penalty provisions,[13] neither that section nor the pertinent definitional section,

---

[13] Under that 1993 amendment, three years of the sentence imposed for a violation of § 53a-94 (a) shall not be suspended or reduced. Public Acts 1993, No. 93-148, § 1, codified at General Statutes § 53a-94 (b).

General Statutes § 53a-91, has been subject to any substantive amendments since it first was enacted in 1969.[14]

Finally, since 1977, when this court first rejected a claim that a kidnapping conviction could not be based

[14] We note that, following this court's opinion in *State* v. *Luurtsema*, supra, 262 Conn. 179, three bills were introduced proposing amendments to the statutory definition of kidnapping in direct response to that decision. See An Act Concerning Asportation in Kidnapping Cases, Raised Bill No. 1284, 2005 Sess. (proposing that § 53a-91 [2] be amended to provide that " 'abduct' means to . . . carry away a person under coercion and restraint to another place with intent to prevent . . . such person's liberation and to a degree that is not incidental to the commission of another crime"); An Act Concerning Asportation in Kidnapping Cases, Senate Bill No. 530, 2005 Sess. (proposing "[t]hat [General Statutes §§] 53a-91 to 53a-94a . . . be amended to provide that the crime of kidnapping requires substantial restriction on movement of the victim"); An Act Concerning Asportation in Kidnapping Cases, Raised Bill No. 1159, 2003 Sess. (proposing that § 53a-91 [2] be amended to provide that " 'abduct' means to . . . carry away a person under coercion and restraint to another place with intent to prevent . . . such person's liberation and to a degree that is not incidental to the commission of another crime"). None of these bills, however, was reported out of committee. The state contends that the failure of these proposals in committee is evidence that the legislature perceived them as lacking in merit. The state's assertion is not persuasive. As this court previously has observed, "[w]e are reluctant to draw inferences regarding legislative intent from the failure of a legislative committee to report a bill to the floor . . . because in most cases the reasons for that lack of action remain unexpressed and thus obscured in the mist of committee inactivity." *In re Valerie D.*, 223 Conn. 492, 518 n.19, 613 A.2d 748 (1992); accord *Conway* v. *Wilton*, supra, 238 Conn. 679–80. Furthermore, "we are unaware of any occasion in which this court has relied on a legislative committee's rejection of a proposed bill as evidence of the intent of the entire General Assembly, which never voted on or discussed the proposal." *Ricigliano* v. *Ideal Forging Corp.*, 280 Conn. 723, 741–42, 912 A.2d 462 (2006); see also *Bob Jones University* v. *United States*, 461 U.S. 574, 600, 103 S. Ct. 2017, 76 L. Ed. 2d 157 (1983) ("unsuccessful attempts at legislation are not the best of guides to legislative intent" [internal quotation marks omitted]); cf. *In re Valerie D.*, supra, 518 n.19 (although no inference of legislative intent generally may be drawn from failure of legislative committee to report bill to floor, weight should be given to legislative committee's rejection of proposed bill when [1] committee adopted second proposed bill that took directly contrary approach to first bill, [2] both bills were considered together, [3] legislative history of committee hearings contained testimony regarding relative merits and demerits of two disparate approaches represented in bills, and [4] legislature passed bill endorsed by committee).

on conduct involving a restraint that is merely incidental to the commission of another crime, the courts of many other states have reached a contrary conclusion in interpreting their kidnapping statutes.[15] In fact, some of those courts have overruled prior precedent that had construed kidnapping statutes broadly to encompass a restraint that is merely incidental to the commission of another crime.[16] Indeed, we now are in the distinct minority of jurisdictions that continue to adhere to the view that a kidnapping conviction may be sustained even when the restraint that forms the basis of that conviction is no greater in severity or duration than the restraint necessary to complete another crime, such as assault or robbery. Of course, the mere fact that a majority of states construe their kidnapping statutes differently than we have construed our kidnapping statutes does not necessarily mean that our construction is wrong; the decisive trend away from the construction that we previously have adopted, however, does support the contention that our reexamination of that construction is appropriate.[17]

---

[15] We set forth these cases subsequently in this opinion.

[16] For example, the highest courts of the states of New York and California have overruled their prior precedent in adopting the interpretation of their kidnapping statutes that the defendant urges us to adopt for purposes of this state's kidnapping statutes. See People v. Daniels, 71 Cal. 2d 1119, 1139, 459 P.2d 225, 80 Cal. Rptr. 897 (1969) (overruling People v. Chessman, 38 Cal. 2d 166, 238 P.2d 1001 [1951], cert. denied, 343 U.S. 915, 72 S. Ct. 650, 96 L. Ed. 1330 [1952]); People v. Levy, 15 N.Y.2d 159, 164–65, 204 N.E.2d 842, 256 N.Y.S.2d 793 (overruling People v. Florio, 301 N.Y. 46, 92 N.E.2d 881 [1950]), cert. denied, 381 U.S. 938, 85 S. Ct. 1770, 14 L. Ed. 2d 701 (1965). In Daniels, moreover, the California Supreme Court expressly rejected the claim that the California legislature effectively had acquiesced in the holding in Chessman and, therefore, that that holding should not be revisited. People v. Daniels, supra, 1127–28. After acknowledging that the legislature had not seen fit to amend the California kidnapping statutes, the court in Daniels nevertheless concluded that it "should not hesitate to reconsider [its] prior construction of [legislative] intent whenever such a course is dictated by the teachings of time and experience." Id., 1128.

[17] We note, moreover, that this court previously has indicated that there may be factual scenarios in which a kidnapping conviction would constitute "an absurd and unconscionable result" because of the limited duration of

In sum, although the doctrine of legislative acquiescence may provide a compelling reason for a court to refrain from reexamining its prior precedent construing a particular statutory provision; see, e.g., *Hummel* v. *Marten Transport, Ltd.*, supra, 282 Conn. 501–502 (rejecting claim that this court should revisit prior precedent construing statute as containing final judgment requirement because, inter alia, court previously had rejected identical claim in reliance on legislative acquiescence principle); at other times, the particular circumstances make "legislative silence . . . ambiguous . . . and [therefore] an unreliable indicator of legislative intent." *Commission on Human Rights & Opportunities* v. *Board of Education*, supra, 270 Conn. 724. For the foregoing reasons, we conclude that this is such a case.[18] Accordingly, we accept the defendant's invitation to revisit and reconsider our prior construction of the kidnapping statutes.

the confinement or the slight degree of movement. (Internal quotation marks omitted.) *State* v. *Luurtsema*, supra, 262 Conn. 203–204; accord *State* v. *Tweedy*, 219 Conn. 489, 502, 594 A.2d 906 (1991); see also *State* v. *Troupe*, 237 Conn. 284, 313–15, 677 A.2d 917 (1996). In light of the suggestion in these cases that this court could remedy any such unfairness on a case-by-case basis, the legislature may have been less inclined to make changes to the kidnapping statutes than it otherwise would have been. As our case law interpreting those statutes has evolved, however, it is apparent that any such limitation on the reach of our kidnapping statutes is reserved for the rare factual scenario in which the restraint is so minimal that the statute would be unconstitutionally vague as applied to that scenario. Cf. *State* v. *Luurtsema*, supra, 203–204 (rejecting claim that evidence was insufficient to uphold kidnapping conviction and noting that defendant had failed to raise challenge to conviction on ground that kidnapping statute was unconstitutionally vague as applied to defendant's brief restraint of victim); id., 204 (*Borden, J.*, concurring) (expressing view that challenge to kidnapping conviction on ground that degree of movement was slight or duration of confinement was minimal must be raised as constitutional claim). But cf. id., 211–13 (*Katz, J.*, dissenting in part) (concluding that kidnapping conviction was absurd and unconscionable result warranting reversal of judgment of conviction on basis of defendant's " 'miniscule movement' " of victim).

[18] In rejecting our reasons for concluding that the doctrine of legislative acquiescence is not an absolute bar to reconsidering our prior interpretation of this state's kidnapping statutes, the dissent purports to distinguish factu-

The principles that govern our task are well established. Because it involves construction of a statute, our review is plenary. See, e.g., *State* v. *Bell*, 283 Conn. 748, 786, 931 A.2d 198 (2007). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Southern New England Telephone Co.* v. *Cashman*, 283 Conn. 644, 650–51, 931 A.2d 142 (2007). In accordance with § 1-2z, we begin our review of the defendant's claim with the language of the kidnapping statutes and other related statutory provisions.

The crime of kidnapping and other offenses primarily involving restrictions of another person's liberty, including unlawful restraint and custodial interference,

ally each of the cases that we have cited in support of our ultimate conclusion that, under the particular circumstances of this case, reconsideration of that prior case law is warranted. Although those cases involve different statutes and different interpretative histories, each case stands for a principle that, for reasons that we have identified, is applicable to the present case.

are set forth in part VII of the Connecticut Penal Code, General Statutes § 53a-91 et seq. Under those provisions, the hallmark of a kidnapping is an abduction, whereas the hallmark of an unlawful restraint, a less serious crime, is a restraint.[19] Under § 53a-91, the definition of the term "abduct" incorporates and builds on the definition of the term "restrain." Thus, under subdivision (1) of General Statutes § 53a-91, " '[r]estrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent." Under General Statutes § 53a-91 (2), " '[a]bduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation."

---

[19] For example, a person commits the crime of kidnapping in the second degree in violation of § 53a-94, the crime of which the defendant in the present case was convicted, "when he *abducts* another person." (Emphasis added.) General Statutes § 53a-94 (a). By contrast, a person commits the crime of unlawful restraint in the second degree "when he *restrains* another person." (Emphasis added.) General Statutes § 53a-96 (a). We also note that the existence of certain aggravating circumstances marks the difference between the crimes of unlawful restraint in the second degree and unlawful restraint in the first degree. Compare General Statutes § 53a-95 (a) with General Statutes § 53a-96 (a). A person commits the offense of unlawful restraint in the first degree when he restrains another person "under circumstances which expose such other person to a substantial risk of physical injury." General Statutes § 53a-95 (a). The existence of certain aggravating circumstances also distinguishes the crimes of kidnapping in the first degree and kidnapping in the second degree. Thus, under General Statutes § 53a-92 (a), a person commits kidnapping in the first degree when "he abducts another person" *and* "(1) [h]is intent is to compel a third person (A) to pay or deliver money or property as ransom or (B) to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function."

The penalties for kidnapping are substantially more severe than the penalties for unlawful restraint. Unlawful restraint in the second degree, for example, is a class A misdemeanor; General Statutes § 53a-96 (b); punishable by a term of imprisonment of not more than one year. See General Statutes § 53a-36. Kidnapping in the second degree, however, is a class B felony; General Statutes § 53a-94 (b); punishable by up to twenty years imprisonment, a portion of which sentence may not be suspended.[20] See General Statutes §§ 53a-35a and 53a-94 (b).

Since 1977, we have had numerous opportunities to examine the scope of the kidnapping statutes, generally in response to a claim that the crime of kidnapping was not intended to apply to a restraint that was merely incidental to the commission of another crime. See, e.g., *State* v. *Luurtsema,* supra, 262 Conn. 200; *State* v. *Wilcox,* supra, 254 Conn. 465–66; *State* v. *Amarillo,* supra, 198 Conn. 304–306; *State* v. *Vass,* 191 Conn. 604, 614, 469 A.2d 767 (1983); *State* v. *Johnson,* 185 Conn. 163, 177–78, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Briggs,* 179 Conn. 328, 338–39, 426 A.2d 298 (1979), cert. denied, 477 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); *State* v. *DeWitt,* 177 Conn. 637, 640–41, 419 A.2d 861 (1979); *State* v. *Lee,* supra, 177 Conn. 342–43; *State* v. *Chetcuti,* supra, 173 Conn. 170. In reliance on a literal application of the statutory language, we consistently have rejected that claim, explaining that, because the statutory definitions of the terms "restrain" and "abduct" contain no time or distance specifications, the

---

[20] The disparities in punishment are comparable for the first degree offenses. Unlawful restraint in the first degree is a class D felony; General Statutes § 53a-95 (b); punishable by a term of imprisonment of not less than one year and not more than five years; see General Statutes § 53a-35a; whereas kidnapping in the first degree is a class A felony; General Statutes § 53a-92 (b); punishable by a term of imprisonment of between ten and twenty-five years. See General Statutes § 53a-35a.

offense of kidnapping does not require proof that the victim was confined for any minimum period of time or moved any minimum distance.[21] See, e.g., *State* v. *Luurtsema*, supra, 201–202; *State* v. *Chetcuti*, supra, 170–71. We also have explained that, because there is no general prohibition against a person being convicted of multiple crimes arising out of the same act or acts, it is of no moment that the confinement or movement that provides the basis of a kidnapping conviction is merely incidental to the commission of another crime against the victim. See *State* v. *Luurtsema*, supra, 203; *State* v. *Wilcox*, supra, 466; *State* v. *Amarillo*, supra, 305; *State* v. *Vass*, supra, 614–15; *State* v. *Johnson*, supra, 178; *State* v. *Briggs*, supra, 338–39. Accordingly, the proper inquiry for a jury evaluating a kidnapping charge is not whether the confinement or movement of the victim was minimal or incidental to another offense against the victim but, rather, whether it was accomplished with the requisite intent, that is, to prevent the victim's liberation. See, e.g., *State* v. *Luurtsema*, supra, 202–203; *State* v. *Wilcox*, supra, 466; *State* v. *Amarillo*, supra, 305.

In *Luurtsema*, we applied these principles strictly in upholding the first degree kidnapping conviction of the defendant, Peter Luurtsema, whose restraint of the victim was both minimal and entirely coextensive with the defendant's attempted sexual assault of the victim. See *State* v. *Luurtsema*, supra, 262 Conn. 200–204. In the hours leading up to the attempted sexual assault, the victim was Luurtsema's consensual social companion,

---

[21] As we previously noted, however; see footnote 17 of this opinion; this court has recognized that "there are conceivable factual situations in which charging a defendant with kidnapping based [on] the most minuscule [movement or duration of confinement] would result in an absurd and unconscionable result . . . ." *State* v. *Luurtsema*, supra, 262 Conn. 203–204. A challenge to a kidnapping conviction predicated on such miniscule movement or duration of confinement remains viable on constitutional grounds under the vagueness doctrine. See id., 204.

and she was able to escape moments after Luurtsema had commenced his unsuccessful attempt to assault her sexually by pulling her to the floor, removing her pants and underpants, forcing her legs apart and choking her. Id., 183. In this regard, the case differed from its predecessors, all of which had involved a greater degree of movement or duration of confinement. Thus, Justice Borden, who joined the majority opinion in *Luurtsema*, authored a separate concurrence in which he observed that, when, "as in [Luurtsema's] case, the degree of movement of the victim, or the length of time she was forcibly restrained, may appear to be very slight, and where those same facts may form part of the elements of the conviction for attempted sexual assault in the first degree, it may seem counterintuitive to conclude that the evidence was nonetheless also sufficient for a conviction of kidnapping."[22] Id., 204 (*Borden, J.*, concurring). Justice Katz dissented, concluding that, because Luurtsema's restraint of the victim was minimal and merely incidental to and necessary for the attempted sexual assault, his conviction of kidnapping constituted an "absurd and unconscionable result." Id., 211–12 (*Katz, J.*, dissenting in part); see also id., 208–11 (*Katz, J.*, dissenting in part) (contrasting prior cases of this court in which restraint imposed on victim of alleged kidnapping was not essential to commission of underlying sexual assault).

In light of the considerations identified by Justices Borden and Katz in *Luurtsema*, and because of the relative severity of the penalties available upon conviction of the crime of kidnapping, a close examination

[22] Justice Borden ultimately agreed with the majority in *Luurtsema*, however, that any challenge to a kidnapping conviction based on "the arguable slightness of the movement and brevity of the forcible restraint" must be confined "to a claim that the kidnapping statute [is] unconstitutionally vague as applied to the facts of the particular case"; *State* v. *Luurtsema*, supra, 262 Conn. 205 (*Borden, J.*, concurring); a claim that Luurtsema had not raised on appeal. Id., 206 (*Borden, J.*, concurring).

of the relevant statutory language is warranted. That examination reveals an ambiguity. As we previously explained, and in accordance with the statutory definitions of the terms "abduct" and "restrain," our decisions have established that a defendant may be convicted of kidnapping upon proof that he restrained a victim when that restraint is accompanied by the requisite intent. Those previous decisions, however, have not explored the parameters of that intent, in particular, how the "intent to prevent [a victim's] liberation"; General Statutes § 53a-91 (2); that is, the intent necessary to establish an abduction, differs from the intent "to interfere substantially with [a victim's] liberty"; General Statutes § 53a-91 (1); that is, the intent necessary to establish a restraint. Certainly, when an individual intends to interfere substantially with another person's liberty, he also intends to keep that person from escaping, at least for some period of time; in other words, he intends to prevent that person's liberation. Thus, the point at which an intended interference with liberty crosses the line to become an intended prevention of liberation is not entirely clear.

At least in a case not involving the secreting of a victim in a place that he or she is unlikely to be found; see General Statutes § 53a-91 (2) (A); it is the intent element *only* that differentiates an abduction—the sine qua non of the crime of kidnapping—from a mere unlawful restraint, and the relatively minor penalties attendant to the latter offense.[23] Because the statutory

---

[23] Although, at first glance, it may appear that an abduction within the meaning of § 53a-91 (2) (B) may be distinguished from a restraint for purposes of § 53a-91 (1) by virtue of the former subdivision's requirement of the threatened or actual use of physical force or intimidation, a closer reading of the statutory definition of "restrain" demonstrates that the distinction is largely illusory. Under § 53a-91 (1), the term "restrain" contemplates the unlawful and nonconsensual movement or confinement of a victim. Although it is true that a restraint may be accomplished by "deception"; see General Statutes § 53a-91 (1) (A); in the vast majority of cases, the restraint will be achieved through the use of force or intimidation. Indeed, a review of appellate decisions upholding convictions for unlawful restraint against

language itself does not elaborate on this distinction, we seek further interpretive guidance to resolve the ambiguity created by § 53a-91. We therefore turn to the history and circumstances surrounding the enactment of the kidnapping statutes, the policies that those statutes were designed to implement and their relationship

claims of evidentiary insufficiency indicates that most such cases involve the use of physical force or intimidation. See, e.g., *State* v. *Monk*, 198 Conn. 430, 431–32, 503 A.2d 591 (1986) (defendant, along with his cousin, forced victim to enter car, drove her to park, forced her to return to car when she exited it, held her down, choked and sexually assaulted her); *State* v. *Rothenberg*, 195 Conn. 253, 254–55, 487 A.2d 545 (1985) (defendant prevented victim from leaving condominium by closing door as she tried to exit, held her arms, alternately promised to allow her to leave and threatened her, then pulled her to couch and sexually assaulted her); *State* v. *Pauling*, 102 Conn. App. 556, 560, 925 A.2d 1200 (defendant grabbed victim's hair, slapped her face three times, grabbed her throat, threw her on bed, held her down and threatened to kill her), cert. denied, 284 Conn. 924, 933 A.2d 727 (2007); *State* v. *Youngs*, 97 Conn. App. 348, 351, 904 A.2d 1240 (defendant dragged victim to his car by overpowering her physically and using threatening language, and prevented her from leaving car by using automatic door locks), cert. denied, 280 Conn. 930, 909 A.2d 959 (2006); *State* v. *Jordan*, 64 Conn. App. 143, 145, 781 A.2d 310 (2001) (defendant pulled victim up steps by her hair, pinned her to bed by her shoulders, struck her in face and hit her with juice bottle); *State* v. *Coleman*, 52 Conn. App. 466, 467–68, 470, 727 A.2d 246 (defendant confronted smaller, ill victim in club bathroom, held her shoulder, braced her with his body weight and sexually assaulted her), cert. denied, 249 Conn. 902, 732 A.2d 776 (1999); *State* v. *Luster*, 48 Conn. App. 872, 874, 713 A.2d 277 (defendant unlawfully entered victim's apartment, jumped on top of her in bed, and pulled and hit her), cert. denied, 246 Conn. 901, 717 A.2d 239 (1998); *State* v. *Coleman*, 42 Conn. App. 78, 80–81, 679 A.2d 950 (1996) (defendant entered victim's residence, put his hand over her mouth, threatened to harm her, pulled her to edge of bed and sexually assaulted her, threw blanket over her and told her not to move for five minutes), rev'd on other grounds, 241 Conn. 784, 699 A.2d 91 (1997). In none of these cases was the defendant charged with kidnapping, although each case involved the use or threatened use of force; rather, in each such case, the defendant was charged with and convicted of unlawful restraint, as well as the underlying crime that gave rise to the unlawful restraint conviction. See *State* v. *Monk*, supra, 430–31 (first degree sexual assault); *State* v. *Rothenberg*, supra, 254 (first degree sexual assault); *State* v. *Pauling*, supra, 558 (third degree assault); *State* v. *Youngs*, supra, 350 (criminal violation of protective order); *State* v. *Jordan*, supra, 144 (third degree assault); *State* v. *Coleman*, supra, 52 Conn. App. 466–67 (first degree sexual assault); *State* v. *Luster*, supra, 873 (third degree assault of person sixty years of age or

to common-law kidnapping principles. See, e.g., *Southern New England Telephone Co.* v. *Cashman*, supra, 283 Conn. 650–51.

Kidnapping, a common-law misdemeanor, traditionally was defined as the forcible removal of another individual from the country. See 3 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 18.1, p. 4; see also 4 W. Blackstone, Commentaries on the Laws of England (1769) p. 219. Early American statutes defining the crime retained the requirement of a boundary crossing but relaxed the requirement by proscribing the victim's forcible removal from the state. See note, "From Blackstone to *Innis*: A Judicial Search for a Definition of Kidnapping," 16 Suffolk U. L. Rev. 367, 368 (1982). Over time, however, the scope of proscribed behavior and the penalties attendant to a kidnapping conviction were broadened substantially by state legislatures. See 3 W. LaFave, supra, § 18.1, pp. 4–5; see also note, "A Rationale of the Law of Kidnapping," 53 Colum. L. Rev. 540 (1953). In the early twentieth century, kidnappings for ransom had become increasingly common, and state lawmakers responded by amending kidnapping statutes to criminalize a wider range of conduct and to authorize more severe sentences upon conviction. See note, supra, 53 Colum. L. Rev. 540. This trend intensified in the wake of the highly publicized kidnapping and murder of the young son of famed aviator Charles Lindbergh in 1932 and the public outcry that followed. See 3 W. LaFave, supra, § 18.1, p. 4. Among the evils that both the common law and later statutory prohibitions against kidnapping sought to address were the isolation of a victim from the protections of society and the law and the special fear and danger inherent in such isolation.

The evolution of Connecticut's kidnapping statutes tracks these developments. Prior to 1901, our kidnapping statute focused primarily on the unlawful removal

older); *State* v. *Coleman*, supra, 42 Conn. App. 79–80 (first degree sexual assault).

of a person from the state, and carried a penalty of a fine and a relatively short period of imprisonment. See General Statutes (1887 Rev.) § 1416.[24] In 1901, the definition of kidnapping was expanded to include intrastate abductions for the purpose of extracting ransom, and the maximum penalty was increased to thirty years imprisonment. See General Statutes (1902 Rev.) § 1162.[25] In 1937, the statutory definition was broadened again to encompass most types of restriction of a victim's liberty, and the penalties available for a violation of the provision were among the most severe of any penal statute. See General Statutes (1949 Rev.) § 8372.[26]

---

[24] General Statutes (1887 Rev.) § 1416 provides: "Every person who shall kidnap, or fraudulently decoy out of this State, any person, or shall, without lawful authority, arrest or imprison any person, with intent to have him carried out of this State, or to be in any way held in service against his will, shall be fined not more than five hundred dollars, and imprisoned not more than three years."

[25] General Statutes (1902 Rev.) § 1162 provides: "Every person who shall kidnap, or fraudulently decoy any person out of this state, or shall, maliciously and without lawful authority, arrest or imprison any person with intent to have him carried out of this state, or in any way detained against his will; and every person who shall fraudulently or forcibly restrain any person of his liberty with intent to demand a ransom for his release, or who shall thereafter threaten physically to injure or to kill such person so fraudulently or forcibly restrained of his liberty, in case a demand for such ransom for his release is not complied with, shall be imprisoned not more than thirty years."

[26] General Statutes (1949 Rev.) § 8372 provides: "Any person who shall kidnap or fraudulently decoy any person into or out of this state or who shall, maliciously and without lawful authority, arrest or imprison any person with intent to have him carried out of this state or in any way detained against his will, and any person who shall fraudulently or forcibly restrain any person of his liberty, for revenge or with intent to demand a ransom, reward, concession or other valuable thing for his release, or who, with such intent, shall use any force or violence or threaten to harm or injure such person, or to fraudulently or forcibly restrain him of his liberty, shall, if death result to the person so kidnapped or restrained of his liberty, be subject to the penalties provided by the general statutes for the crime of murder, and proof of wilful, deliberate and premeditated killing or of a specific intent to kill in such case shall not be required of the state. If death shall not result to the person so kidnapped or restrained of his liberty, the person convicted of such crime shall be imprisoned in the State Prison not more than fifty years. Any person who shall conspire with another to violate

Indeed, in cases resulting in the death of the kidnapping victim, the penalty was the same as the penalty for murder, even though the state was not required to prove that the death was either premeditated or the product of a specific intent to kill. See General Statutes (1949 Rev.) § 8372. If the victim survived, his kidnapper faced up to fifty years imprisonment. See General Statutes (1949 Rev.) § 8372.

Beginning in the 1950s, however, questions surfaced about the propriety of such expansively worded kidnapping statutes. In particular, concerns were expressed that the newly adopted kidnapping statutes permitted the imposition of extremely severe sanctions for a broad and ill defined range of behavior, including relatively trivial types of restraint. See 3 W. LaFave, supra, § 18.1, pp. 4–5. Moreover, as one commentator noted, "virtually all conduct within the scope of kidnapping law [was] punishable under some other criminal provision: e.g., extortion, homicide, assault, rape, robbery, statutory rape, [and] contributing to the delinquency of a minor . . . . Consequently, the practical effect of kidnapping law [was] to permit the imposition of additional sanctions when one of [those] other crimes [was] accompanied by a detention and asportation." Note, supra, 53 Colum. L. Rev. 556.

These concerns prompted calls for legislative reform by the drafters of the Model Penal Code. As the drafters stated in the commentary to the proposed code, the goal was "to devise a proper system of grading to discriminate between simple false imprisonment and the more terrifying and dangerous abductions for ransom or other felonious purpose." Model Penal Code § 212.1, comment 1, p. 11 (Tentative Draft No. 11, 1960). The drafters, noting that "[e]xamples of abusive prosecution

any of the provisions of this section shall be imprisoned in the State Prison not more than thirty years."

for kidnapping [were] common," also sought "to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to serious injustice . . . ." Id., p. 13. The drafters advocated for statutory schemes that would "minimize opportunities for such injustice by clearly and rationally restricting [prosecutorial] discretion to punish." Id., p. 15.

Contraction of the scope of kidnapping law also was effected through the courts. In the landmark case of *People* v. *Levy*, 15 N.Y.2d 159, 163–65, 204 N.E.2d 842, 256 N.Y.S.2d 793, cert. denied, 381 U.S. 938, 85 S. Ct. 1770, 14 L. Ed. 2d 701 (1965), the New York Court of Appeals rejected a literal application of New York's broadly worded kidnapping statute to the detention and movement of two armed robbery victims during the course of the robbery. The court noted that the provision at issue, which defined kidnapping as "confin[ing] another with intent to cause him . . . to be confined against his will"; (internal quotation marks omitted) id., 164; "could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes." Id. The court concluded that the legislature did not intend for "restraints, sometimes accompanied by asportation, which are incidents to other crimes and have long been treated as integral parts of other crimes . . . to constitute a separate crime of kidnapping, even though kidnapping might sometimes be spelled out literally from the statutory words." Id.; see also *People* v. *Lombardi*, 20 N.Y.2d 266, 270, 229 N.E.2d 206, 282 N.Y.S.2d 519 (1967) ("the direction of the criminal law has been to limit the scope of the kidnapping statute, with its very substantially more severe penal consequences, to true kidnapping situations and not to

apply it to crimes which are essentially robbery, rape or assault and in which some confinement or asportation occurs as a subsidiary incident").

Soon thereafter, the Supreme Court of California, in *People* v. *Daniels*, 71 Cal. 2d 1119, 459 P.2d 225, 80 Cal. Rptr. 897 (1969), a case involving a series of robberies and sexual assaults in which the victims had been forced to move short distances in the moments immediately preceding the commission of those crimes; see id., 1123–25; followed the approach of the New York Court of Appeals in *Levy*. Id., 1134–36. At the time, kidnapping was defined in the California Penal Code as "the act of one who forcibly steals, takes, or arrests any person in th[e] state, and carries him into another country, state, or county, or into another part of the same county." (Internal quotation marks omitted.) Id., 1126. The court overruled its earlier, literal interpretation of the kidnapping provision in light of the contemporaneous "current of common sense in the construction and application of [kidnapping] statutes"; id., 1127; and concluded that the statute did not apply to the defendants in that case because their movement of the victims was minimal and incidental to other crimes, that is, those movements were compelled solely to facilitate the commission of the sexual assaults and robberies. Id., 1130–31, 1134, 1140. The court found support for its conclusion in the holdings of *Levy* and *Lombardi*, despite differences in the wording of New York's kidnapping statutes, because the reasoning of the New York Court of Appeals was persuasive and representative of the more enlightened, modern approach.[27] Id., 1134–37.

---

[27] The dissent identifies several differences between this state's kidnapping statutes and New York's kidnapping statutes, and then asserts that those differences counsel against any reliance on New York case law interpreting the New York statutory scheme. The dissent fails to explain, however, *why* those differences diminish the persuasive force of those New York cases.

This state's current kidnapping statutes were drafted against the foregoing historical backdrop, and as part of a comprehensive revision of the criminal code that was approved by the legislature in 1969. Although the legislative debate surrounding the revision of the code did not focus on the kidnapping statutes, published commentary by the commission to revise the criminal statutes (commission) sheds light on the reasoning underlying the changes that were made to those statutory provisions. That commentary indicates that the commission intended to create a new statutory scheme that recognized varying degrees of unlawful restrictions on a victim's liberty by drawing a distinction between a "restraint," which, standing alone, comprises the crime of unlawful restraint, and an "abduction," which comprises the crime of kidnapping. The goal was to improve on the then-existing statute, which "put all the varying degrees of restriction of liberty under the one umbrella of kidnapping"; Commission to Revise the Criminal Statutes, Connecticut Penal Code Comments (1971) § 53a-91, p. 31, reprinted in 28A Conn. Gen. Stat. Ann. § 53a-91 (West 2007) p. 423; along with the attendant harsh penalties.

We note, finally, that when drafting the revised criminal code, the commission drew generally from comparable provisions of New York's Revised Penal Law and the Model Penal Code. Commission to Revise the Criminal Statutes, supra, tit. 53a, p. 1, reprinted in 28 Conn. Gen. Stat. Ann. tit. 53a (West 2007) p. 289. Overall, the commission sought to create a code that met certain standards: "that it be rational, coherent, cohesive and intelligible; that it take into account modern knowledge and information; that it be based on reason and experience; and that it reflect an enlightened and informed outlook." Commission to Revise the Criminal Statutes, Proposed Connecticut Penal Code (1969) p. 7.

Upon examination of the common law of kidnapping, the history and circumstances surrounding the promulgation of our current kidnapping statutes and the policy objectives animating those statutes, we now conclude the following: Our legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime.[28]

---

[28] The dissent asserts that the statutory definitions underlying unlawful restraint and kidnapping clearly and unambiguously distinguish the former as a general intent crime and the latter as a specific intent crime, and, as a consequence, an examination of the history and circumstances surrounding the enactment of these provisions is inappropriate. The dissent reaches the conclusion that unlawful restraint is a general intent crime by reading the term "intentionally" in General Statutes § 53a-91 (1) as applying only to that element of the offense that prohibits conduct designed "to restrict a person's movements . . . by moving him . . . or by confining him . . . ." Under General Statutes § 53a-5, however, when a statute defining a criminal offense uses a term such as "intentionally" to specify a requisite mental state, that term "is presumed to apply *to every element of the offense* unless an intent to limit its application clearly appears." (Emphasis added.) Applying the directive of § 53a-5 to § 53a-91 (1), we conclude that "intentionally" also applies to the element of the offense of unlawful restraint that requires a particular result, namely, that the restriction must "interfere substantially with [a person's] liberty . . . ." (Emphasis added.) General Statutes § 53a-91 (1). As the dissent correctly observes, "[w]hen the elements of a crime include a defendant's intent to achieve some result additional to the act, the additional language distinguishes the crime from those of general intent and makes it one requiring a specific intent." (Internal quotation marks omitted.) Because an unlawful restraint involves the restriction of another person's movements with the intent to interfere substantially with that person's liberty, the crime of unlawful restraint, like kidnapping, is a specific intent crime.

This interpretation is buttressed by several other considerations. First, to be an unlawful restraint, the prohibited restriction of movement must be

Our failure previously to recognize such an exclusion largely has eliminated the distinction between restraints and abductions and effectively has merged the statutory scheme such that it now closely resembles the provision that the scheme was intended to replace. Unfortunately, that interpretation has afforded prosecutors virtually

accomplished without the victim's consent. Under the dissent's interpretation of § 53a-91 (1) pursuant to which the mens rea requirement applies only to the prohibited conduct, a person may be convicted of the crime of unlawful restraint without knowing that the restriction was not consensual. We see no reason why the legislature would have intended such a result.

Second, "[c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . [U]nless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." (Citation omitted; internal quotation marks omitted.) *State* v. *Velasco*, 253 Conn. 210, 220, 751 A.2d 800 (2000); see also *State* v. *Skakel*, supra, 276 Conn. 675 ("[s]trict construction is a means of assuring fairness to persons subject to the law by requiring penal statutes to give clear and unequivocal warning in language that people generally would understand, concerning actions that would expose them to liability for penalties and what the penalties would be" [internal quotation marks omitted]). Although we believe that applying § 53a-5 to § 53a-91 (1) makes it clear that unlawful restraint is a specific intent crime, the rule of strict construction applicable to criminal statutes indicates that any arguable ambiguity should be resolved against the broad reading of § 53a-91 (1) that the dissent advocates.

Finally, the dissent's conclusion also is inconsistent with this court's analysis in *State* v. *Foster*, 202 Conn. 520, 538–40, 522 A.2d 277 (1987). In *Foster*, the defendant, Michael Foster, challenged the portion of the trial court's jury instruction defining the term "restrain" for purposes of § 53a-91 (1), claiming that "the court inadequately explained that the state must prove that [Foster] had to have the *conscious objective* to interfere substantially with the victim's liberty" because, according to Foster, the language that the court used had "permitted the jury to find [Foster] guilty even if the interference was nothing more than an unintended by-product of [Foster's] intentional acts." (Emphasis added.) Id., 539. In rejecting Foster's argument that the court's charge did not satisfy the requirement that a defendant act with the specific intent to effect the prohibited result, we impliedly acknowledged that a restraint is unlawful if, and only if, a defendant's conscious objective in moving or confining the victim is to achieve that prohibited result, namely, to restrict the victim's movements in such a manner as to interfere substantially with his or her liberty. See id., 539–40; see also *State* v. *Youngs*, 97 Conn. App. 348, 363, 904 A.2d 1240 (characterizing unlawful restraint as specific intent crime), cert. denied, 280 Conn. 930, 909 A.2d 959 (2006); *State* v. *Phu Dinh Le*, 17 Conn. App. 339, 343, 552 A.2d 448 (1989) (same); *State* v. *Davis*, 13 Conn. App. 667, 672, 539 A.2d 150 (1988) (same).

unbridled discretion to charge the same conduct either as a kidnapping or as an unlawful restraint despite the significant differences in the penalties that attach to those offenses. Similarly, our prior construction of the kidnapping statutes has permitted prosecutors— indeed, it has encouraged them—to include a kidnapping charge in any case involving a sexual assault or robbery. In view of the trend favoring reform of the law of kidnapping that existed at the time that our statutes were enacted, and in light of the commission's stated goal of creating a modern, informed and enlightened penal code, it is highly likely that our legislature intended to embrace that reform, thereby reducing the potential for unfairness that had been created under this state's prior kidnapping statutes.[29]

Our conclusion is bolstered by the fact that, in the years since *Levy* and *Daniels*, a considerable majority of state courts have followed the lead of New York and California in concluding that the crime of kidnapping does not include conduct involving a restraint that is merely incidental to the commission of some other crime against the victim. See, e.g., *Patzka* v. *State*, 348 So. 2d 520, 523–24 (Ala. Crim. App. 1977); *Alam* v. *State*, 776 P.2d 345, 349 (Alaska App. 1989); *Summerlin* v. *State*, 296 Ark. 347, 350–51, 756 S.W.2d 908 (1988); *People* v. *Daniels*, supra, 71 Cal. 2d 1130–31, 1134; *People* v. *Bridges*, 199 Colo. 520, 528–29, 612 P.2d 1110 (1980);

---

[29] The dissent maintains that our holding "invades the purview of our state's attorneys" and "appears to overlook that defining crimes is the responsibility of our legislature," not this court. The dissent misapprehends our reasoning. Simply stated, we merely have noted that our prior interpretation of the kidnapping statute inevitably has led to results that we do not believe the legislature anticipated when it enacted the kidnapping statutes. Of course, we frequently, and appropriately, take this consideration into account in construing statutes. See, e.g., *Gormbard* v. *Zurich Ins. Co.*, 279 Conn. 808, 829, 904 A.2d 198 (2006) (rejecting proposed construction of statute on ground that it would lead to result that legislature most likely did not intend); *Bergeson* v. *New London*, 269 Conn. 763, 782, 850 A.2d 184 (2004) (same).

*Tyre* v. *State*, 412 A.2d 326, 329 n.5 (Del. 1980); *Faison* v. *State*, 426 So. 2d 963, 966 (Fla. 1983); *State* v. *Correa*, 5 Haw. App. 644, 649, 706 P.2d 1321, cert. denied, 68 Haw. 692 (1985); *People* v. *Cole*, 172 Ill. 2d 85, 104, 665 N.E.2d 1275, cert. denied, 519 U.S. 1030, 117 S. Ct. 587, 136 L. Ed. 2d 517 (1996); *State* v. *Rich*, 305 N.W.2d 739, 745 (Iowa 1981); *State* v. *Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976); *Spencer* v. *Commonwealth*, 554 S.W.2d 355, 358 (Ky. 1977); *State* v. *Estes*, 418 A.2d 1108, 1113 (Me. 1980); *State* v. *Stouffer*, 352 Md. 97, 112–13, 721 A.2d 207 (1998); *People* v. *Adams*, 389 Mich. 222, 238, 205 N.W.2d 415 (1973); *State* v. *Smith*, 669 N.W.2d 19, 32 (Minn. 2003); *Cuevas* v. *State*, 338 So. 2d 1236, 1238 (Miss. 1976); *State* v. *Shelton*, 78 S.W.3d 200, 204 (Mo. App. 2002); *Wright* v. *State*, 94 Nev. 415, 417–18, 581 P.2d 442 (1978); *State* v. *Masino*, 94 N.J. 436, 447, 466 A.2d 955 (1983); *People* v. *Levy*, supra, 15 N.Y.2d 164; *State* v. *Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338 (1978); *State* v. *Logan*, 60 Ohio St. 2d 126, 135, 397 N.E.2d 1345 (1979); *State* v. *Garcia*, 288 Or. 413, 423, 605 P.2d 671 (1980); *Commonwealth* v. *Hughes*, 264 Pa. Super. 118, 125, 399 A.2d 694 (1979); *State* v. *Innis*, 433 A.2d 646, 655 (R.I. 1981), cert. denied, 456 U.S. 930, 102 S. Ct. 1980, 72 L. Ed. 2d 447 (1982); *State* v. *St. Cloud*, 465 N.W.2d 177, 181 (S.D. 1991); *State* v. *Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991); *State* v. *Goodhue*, 175 Vt. 457, 465–66, 833 A.2d 861 (2003); *Brown* v. *Commonwealth*, 230 Va. 310, 314, 337 S.E.2d 711 (1985); *State* v. *Miller*, 175 W. Va. 616, 621, 336 S.E.2d 910 (1985).[30] Although these cases involve varying statutory language

---

[30] A minority of jurisdictions adhere to the view that any movement or confinement of a victim is sufficient to support a kidnapping conviction. See, e.g., *State* v. *Padilla*, 106 Ariz. 230, 232, 474 P.2d 821 (1970); *Ellis* v. *State*, 211 Ga. App. 605, 608, 440 S.E.2d 235 (1994); *Wilson* v. *State*, 253 Ind. 585, 592, 255 N.E.2d 817 (1970); *State* v. *Smith*, 228 Mont. 258, 263–64, 742 P.2d 451 (1987); *State* v. *Maeder*, 229 Neb. 568, 572–73, 428 N.W.2d 180 (1988); *State* v. *Motsko*, 261 N.W.2d 860, 865–67 (N.D. 1977); *Hines* v. *State*, 75 S.W.3d 444, 447–48 (Tex. Crim. App. 2002); *Harris* v. *State*, 78 Wis. 2d 357, 366–67, 254 N.W.2d 291 (1977).

and analyses, they share a common theme, namely, that it is unlikely that the legislature intended to expose an accused to a kidnapping conviction, and the severe sanctions accompanying such a conviction, when the restraint involved is merely incidental to the commission of a separate, underlying crime. Indeed, this majority view regarding the construction of statutes delineating the crime of kidnapping rightly has been characterized as the "modern" approach; *State* v. *DeJesus*, 91 Conn. App. 47, 87, 880 A.2d 910 (2005), cert. granted, 279 Conn. 912, 903 A.2d 658 (2006); see *State* v. *Goodhue*, supra, 462–63; the salutary effect of which is to prevent the prosecution of a defendant "on a kidnapping charge in order to expose him to the heavier penalty thereby made available, [when] the period of abduction was brief, the criminal enterprise in its entirety appeared as no more than an offense of robbery or rape, and there was lacking a genuine 'kidnapping' flavor . . . ." (Citation omitted.) *People* v. *Cassidy*, 40 N.Y.2d 763, 765–66, 358 N.E.2d 870, 390 N.Y.S.2d 45 (1976).

Our holding does not represent a complete refutation of the principles established by our prior kidnapping jurisprudence. First, in order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement.[31] When that confinement or movement is merely incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime. "[T]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts . . . ." (Internal quotation marks

---

[31] We reiterate, however, that kidnapping convictions involving miniscule restraints remain subject to challenge under the vagueness doctrine. See footnote 17 of this opinion.

omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 528, 782 A.2d 658 (2001) (*McDonald, C. J.*, concurring). In other words, "the test . . . to determine whether [the] confinements or movements involved [were] such that kidnapping may also be charged and prosecuted when an offense separate from kidnapping has occurred asks whether the confinement, movement, or detention was merely incidental to the accompanying felony or whether it was significant enough, in and of itself, to warrant independent prosecution."[32] *State* v. *Goodhue*, supra, 175 Vt. 464.

Conversely, a defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime.[33] Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was *not* merely incidental to the commission of some other,

---

[32] The dissent asserts that our interpretation of the kidnapping statutes represents an "[attempt] to devise a means by which a jury must determine whether the act of restraining was 'incidental' to the commission of the other crime . . . ." In making this assertion, the dissent suggests that we have invented the approach that we have adopted in this opinion. In doing so, the dissent ignores the fact that the courts of a substantial majority of jurisdictions previously have adopted that interpretative approach. Indeed, the dissent gives no weight at all to the fact that our holding, which, as we have indicated, aptly has been characterized as representing the modern approach, reflects the view of the majority of courts that have considered the issue.

[33] The fact that the legislature intended this result is borne out by the language of § 53a-92 (a) (2), which defines kidnapping in the first degree as an abduction coupled with an intent to engage in certain other unlawful conduct. See footnote 19 of this opinion.

separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense. See, e.g., *Virgin Islands* v. *Berry*, 604 F.2d 221, 227 (3d Cir. 1979); *Mendoza* v. *State*, 122 Nev. 267, 130 P.3d 176, 181 (2006); *State* v. *LaFrance*, 117 N.J. 583, 588, 569 A.2d 1308 (1990); *State* v. *Goodhue*, supra, 175 Vt. 463–64.

Second, we do not retreat from the general principle that an accused may be charged with and convicted of more than one crime arising out of the same act or acts, as long as all of the elements of each crime are proven. Indeed, because the confinement or movement of a victim that occurs simultaneously with or incidental to the commission of another crime ordinarily will constitute a substantial interference with that victim's liberty, such restraints still may be prosecuted under the unlawful restraint statutes. Undoubtedly, many crimes involving restraints already are prosecuted under those provisions. Moreover, our holding is relatively narrow and directly affects only those cases in which the state cannot establish that the restraint involved had independent significance as the predicate conduct for a kidnapping. We therefore do not anticipate that our holding will force a major shift in prosecutorial decision making.

Finally, in the present case, the defendant claims that he is entitled to a judgment of acquittal on the kidnapping count. The defendant contends that, in light

of the evidence adduced at trial, no juror reasonably could conclude that the restraint imposed on the victim was not incidental to the restraint used in connection with the assault of the victim. We disagree.

The evidence established that the defendant came up to the victim from behind her and, while she was walking up a staircase, grabbed her by the back of the neck. The victim fell to the floor, and the defendant held her there. She struggled to free herself from the defendant's grasp and screamed for him to let her go. The defendant continued to hold her down, however, and, when she persisted in screaming and fighting to extricate herself, he punched her once in the mouth and attempted to thrust his fingers down her throat. According to the victim, the defendant forced her to remain on the ground for at least five minutes before she was able to get away.

On the basis of these facts, a juror reasonably could find that the defendant's restraint of the victim was not merely incidental to his assault of the victim. The victim testified that the defendant, after accosting her, forcibly held her down for five minutes or more. Although the defendant punched the victim once and shoved his fingers into her mouth, that conduct was very brief in contrast to the extended duration of the defendant's restraint of the victim. In light of the evidence, moreover, a juror reasonably could find that the defendant pulled the victim to the ground primarily for the purpose of restraining her, and that he struck her and put his fingers in her mouth in an effort to subdue her and to prevent her from screaming for help so that she could not escape.[34] In such circumstances, we cannot say that

[34] We acknowledge that it is not clear from the evidence *why* the defendant accosted and restrained the victim. Nevertheless, on the basis of the evidence presented, a juror reasonably could conclude that the defendant's restraint of the victim was not incidental to his assault of the victim. In other words, a juror reasonably could find that the restraint had significance independent of the assault. The facts of this case, therefore, are readily distinguishable from the facts of other cases in which the restraint imposed on the victim

the defendant's restraint of the victim necessarily was incidental to his assault of the victim. Whether the defendant's conduct constituted a kidnapping, therefore, is a factual question for determination by a properly instructed jury. For the foregoing reasons, we conclude that the defendant is entitled to a new trial on the charge of kidnapping in the second degree. Furthermore, the jury must be instructed that, if it finds that the defendant's restraint of the victim was merely incidental to the defendant's commission of another crime against the victim, that is, assault, then it must find the defendant not guilty of the crime of kidnapping.[35]

was merely incidental to an underlying crime. For example, in *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156 (2008), a case that we also decide today, the defendant, Paolino Sanseverino, the owner of a bakery, followed one of his victims, G, his employee, into a back room of the bakery, where she had gone to retrieve an apron. Id., 615. While alone with G, Sanseverino grabbed G, pushed her against the wall and sexually assaulted her. Id. Sanseverino then let G go, and she went into a bathroom and did not come out until she heard another person enter the bakery. Id. G then finished her shift and went home. Id. After a jury trial, Sanseverino was convicted of kidnapping in the first degree and sexual assault in the first degree. Id., 616–17. Upon application of the rule that we adopt in the present case, we concluded that there was no evidence that Sanseverino had restrained G to any degree or for any period of time greater than that necessary to commit the sexual assault. Id., 625. We therefore concluded that, because no reasonable juror could find that the restraint Sanseverino had imposed on G was not incidental to the commission of the sexual assault against G, Sanseverino was entitled to a judgment of acquittal on the kidnapping charge. See id., 625–26. In the present case, by contrast, we cannot say that the evidence requires the conclusion that the defendant restrained the victim solely for the purpose of assaulting her; indeed, a juror reasonably could find that the assaultive conduct in which the defendant engaged was merely incidental to his restraint of the victim.

[35] As we noted previously, the defendant ultimately was not tried for assault. We nevertheless conclude that a defendant is entitled to an instruction that he cannot be convicted of kidnapping if the restraint imposed on the victim was merely incidental to the assault, regardless of whether the state elects to try the defendant for assault, because the facts reasonably would support an assault conviction. See, e.g., *Alam* v. *State*, supra, 776 P.2d 350 (concluding restraint at issue was incidental to uncharged attempted sexual assault); *People* v. *Rappuhn*, 78 Mich. App. 348, 354, 260 N.W.2d 90 (1977) (court improperly failed to give incidental instruction with reference to uncharged offense of gross indecency); *People* v. *Jackson*, 63

## II

We next address the defendant's claim that he is entitled to a new trial on the charges of unlawful restraint in the first degree and risk of injury to a child due to the allegedly improper conduct of the deputy assistant state's attorney (state's attorney) during the trial. Specifically, the defendant contends that the state's attorney improperly (1) suggested to the jury that the defendant had attempted to assault the victim sexually, despite the lack of evidence of any such attempted sexual assault, (2) denigrated defense counsel and asserted that counsel had attempted to mislead the jury, (3) used leading questions excessively during his direct examination of several of the state's witnesses, (4) cross-examined the sole defense witness, and (5) referred to facts not in evidence during closing argument. Although we agree that some of the challenged conduct was improper, we conclude that, collectively, it did not rise to the level of a due process violation requiring a new trial.

"In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine

App. Div. 2d 1032, 1032, 406 N.Y.S.2d 345 (1978) (concluding detention of complainant was incidental to commission of uncharged crime of rape). But cf. *People* v. *Robbins*, 131 Mich. App. 429, 433, 346 N.W.2d 333 (1984) (when no evidence of any other crime, incidental instruction unnecessary). To conclude otherwise would give the state carte blanche to deprive the defendant of the benefit of such an instruction merely by declining to charge him with the underlying crime, which, as in the present case, generally will carry a far less serious maximum possible penalty than the kidnapping charge.

whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Bell*, supra, 283 Conn. 760. With these standards in mind, we turn to the merits of the defendant's claims.

A

1

The defendant first claims that the state's attorney unfairly prejudiced the jury against him by encouraging the jury to speculate that the case involved an attempted sexual assault, a crime with which the defendant was not charged. We agree, in part, with the defendant.

The following additional procedural history is relevant to our review of this contention. When the defendant first was arraigned, he was charged with multiple offenses but no sexual offense. Approximately one year later, on the first day of jury selection, the state's attorney filed an amended information charging the defendant, for the first time, with kidnapping and attempted sexual assault in the third degree. The new information was read to the jury pool during each of the two days of jury selection that followed. On the day before the evidentiary portion of the trial commenced, the defendant filed a motion to dismiss the two new charges, claiming that there was no factual basis for them. Prior to argument on the defendant's motion, the state's attorney filed a substitute information that did not contain the charge of attempted sexual assault in the third degree or any other sexual offense. During argument on the motion, the defendant claimed that the state's

attorney originally had added the attempted sexual assault charge without a factual basis for doing so, solely for the purpose of inducing the defendant to accept a plea bargain. The defendant further claimed that he had been prejudiced by the addition of the count alleging attempted sexual assault. The court rejected the defendant's claim, stating that the defendant had suffered no prejudice because the sexual assault charge had been dropped.

At trial, the state's attorney called the victim as a witness. On direct examination, she testified in detail as to the events at the train station on the evening that she was attacked. In her testimony about those events, the victim explained that, as she and the defendant were struggling on the steps, just before she broke free, the skirt that she was wearing had started to rise. The state's attorney asked the victim what she had on beneath her skirt that evening, and the victim replied that she had been wearing a pair of shorts and under-clothing. The state's attorney then asked the victim: "Did [the defendant] ever get into any of your under-clothing?" Defense counsel objected to the question and, after the jury was excused, moved for a mistrial. Defense counsel argued that, because there was no evidence that a sexual assault had occurred or had been attempted, the line of questioning was improperly suggestive and prejudicial, and demonstrated bad faith on the part of the state's attorney. The state's attorney responded that he merely was trying to narrow his case by establishing that the defendant had not intended to assault the victim sexually but, rather, that he had intended to inflict physical injury on her. The court instructed the state's attorney that it was unnecessary for the state to disprove that the defendant had intended to commit a sexual assault but denied the motion for a mistrial. The trial court agreed, however, to give a

curative instruction and, following the victim's testimony, did so.[36]

Finally, during closing argument, the state's attorney alluded to the defendant's alleged intentions on the night of the incident in question. In particular, the state's attorney made the following statements during the course of his closing argument: "You all know what he wanted to do. You know all what he tried to do and you all know what he accomplished that night. . . . Ask yourself, what was this thirty-two year old, unemployed male at the train station at about [10 to 10:30 p.m.] doing? When he saw that girl walking into a secluded area, you all know what he wanted to do, tried to do and what he did. . . . [The defendant] knew the severity of his actions on a child, what he wanted to do and accomplish." Defense counsel objected to these statements and, again, moved for a mistrial. The trial court overruled defense counsel's objections and denied the motion for mistrial, explaining that the state's attorney's remarks were a reference to the defendant's alleged intent to restrain and abduct the victim, not to assault her sexually. Finally, during his rebuttal argument, the state's attorney reiterated: "You know what [the defendant] wanted to do, he tried to do and what he accomplished? The abduction was accomplished because he held her down with force . . . ."

The defendant contends that the foregoing conduct of the state's attorney was improper because it was designed to inflame the jury by injecting a sexual offense into the case. "[T]his court has recognized on numerous occasions that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they

---

[36] The trial court instructed the jury that the information that the state's attorney filed "does not allege a sexual assault, so I want you to be aware of that. There is no charge of sexual assault in this information, and it's . . . incumbent upon me to so advise here, and thus I have advised you . . . ."

have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Bell*, supra, 283 Conn. 773.

With respect to the state's attorney's pretrial amendments to the original information and his statements during closing argument, we are not persuaded that the conduct was improper. Before a trial commences, a prosecutor has broad authority to add or delete charges, provided the defendant is not unduly prejudiced by those actions. Practice Book § 36-17; see also *State* v. *Tanzella*, 226 Conn. 601, 607, 628 A.2d 973 (1993). Nevertheless, a prosecutor should not bring charges that are unsupported by the evidence. See, e.g., American Bar Association, Standards for Criminal Justice: Prosecution Function and Defense Function (3d Ed. 1993) standard 3-3.9 (f), p. 71 (ABA Standards for Criminal Justice). In the present case, the victim's statement to the police indicated that her skirt had been hiked up during her encounter with the defendant and that, at the time, she believed that he intended to rape her. Accordingly, we cannot conclude that the state's attorney lacked a good faith basis for adding the attempted sexual assault charge even though he later withdrew it.

With respect to the statements made by the state's attorney during closing argument, we will not second-guess the determination of the trial court that those statements did not allude to the withdrawn attempted sexual assault charge. Because the defendant was charged with kidnapping and unlawful restraint, both specific intent crimes, it was reasonable for the court to conclude, as the state's attorney represented, that the comments were intended to highlight for the jury

the evidence adduced by the state establishing an intent to restrain and abduct the victim. The state's attorney's use of the same language in his rebuttal argument, followed immediately by a reference to the alleged abduction, supports that interpretation of those remarks.

The state's attorney's question to the victim as to whether the defendant had tried to get into her underclothing, however, was improper. "A prosecutor should not ask a question which implies the existence of a factual predicate for which a good faith belief is lacking." ABA Standards for Criminal Justice, supra, standard 3-5.7 (d), p. 103. "It is an improper tactic for . . . the prosecutor . . . to attempt to communicate impressions by innuendo . . . when the questioner has no evidence to support the innuendo." Id., standard 3-5.7, commentary, p. 106; see also B. Gershman, Prosecutorial Misconduct (2d Ed. 2007) § 10:20, p. 404 ("[c]ourts have consistently condemned prosecutors' attempts to create an impression on the jury by innuendos in questions when no supporting evidence exists"). By the time the victim testified, the state's attorney had withdrawn the attempted sexual assault charge, and he necessarily was aware that the evidence was inadequate to support a conviction for that offense. Indeed, the explanation that the state's attorney proffered confirms as much. Finally, even if we credit the explanation that the state's attorney gave for the question, that explanation is inadequate to justify the challenged argument because, as the trial court observed, the state did not have the burden of proving that the defendant was *not* trying to assault the victim sexually. We therefore agree with the defendant that it was improper for the state's attorney to ask the victim whether the defendant had attempted to "get into . . . [her] underclothing."

2

The defendant next claims that the state's attorney repeatedly denigrated defense counsel and improperly

asserted that defense counsel was seeking to mislead the jury. We disagree with this claim.[37]

According to the defendant, the state's attorney, during trial, made derogatory remarks about, and facial expressions toward, defense counsel.[38] The challenged remarks, however, were not recorded in the transcript, and the trial court, in response to defense counsel's complaints, indicated that he had not heard them. With respect to the facial expressions, the record reveals that the trial court admonished both counsel for their courtroom behavior[39] but subsequently indicated that their conduct generally had been appropriate.[40] In light

[37] In support of this claim, the defendant refers to, inter alia, several comments that the state's attorney made during jury selection that, according to the defendant, were derisive of defense counsel. The defendant concedes, however, that, with one minor exception, the challenged comments all were made in the presence of jurors who ultimately were excused. Because there is no possibility that those remarks affected the defendant's right to a fair trial, we need not address them.

[38] Specifically, the defendant refers to a comment that the state's attorney allegedly made during trial to one or more persons in the courtroom audience following defense counsel's request that the jury be excused. According to the defendant, the state's attorney said, "[I]t's just typical bullshit, relax." The defendant also claims that the state's attorney muttered the words, "Oh God," under his breath when defense counsel sought permission to recall a witness.

[39] The court stated: "I'm just going to say this one more time. I don't want any more faces. I don't want any more nonsense going on. I want everybody to conduct themselves in a professional manner here. When I make rulings and I allow people to ask questions or not ask questions, no more faces, no more nonsense. Is that understood by everybody in this courtroom?" Both counsel responded in the affirmative. The court continued: "Because if I see any more faces about my rul[ings] or what I allow or what I don't allow, I'm going [to] take the appropriate action. And trust me when I tell you, gentlemen, you don't [want] me to take the appropriate action if I think you're misbehaving in a courtroom. That is something I do not tolerate." The court subsequently reiterated: "I have warned both counsel now. If there [are] any more antics in this courtroom that I become aware of or I see, counsel [was] warned just a few moments ago about the faces that were being made with regard to rulings I was making. If that goes on again, sanctions will be issued."

[40] At the close of court on the day in question, the court observed that it had addressed the claims of improper conduct and encouraged counsel to

of the foregoing, we agree with the state that the record does not support the defendant's claim of prosecutorial impropriety predicated on the state's attorney's allegedly disparaging comments and facial expressions.[41]

The defendant also takes issue with that portion of the state's attorney's rebuttal argument in which he used the terms "red herring" and "smoke screen" to characterize certain issues that defense counsel had raised during his closing argument.[42] The defendant contends that these comments unfairly impugned defense counsel, thereby prejudicing the jury against the defendant. We also reject this claim.

"There is a distinction between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense." *State* v. *Orellana*, 89 Conn. App. 71, 101, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). Moreover, not every use of rhetorical language is improper. E.g., *State* v. *Warholic*, 278 Conn. 354, 363, 897 A.2d 569 (2006). A "red herring" is defined in relevant part as "a

move forward. The court stated: "To be quite candid outside the unusual circumstance here today, I think you've done a professional job, both gentlemen. You [the state's attorney] have an obligation to the people of this state, and you're putting on your case as you see fit. [Defense counsel] has an obligation to the defendant. He's making his objections where he deems appropriate. Both [of] you have abided by rulings, and, when I have finally made myself clear, you've accepted those rulings and moved on. There's nothing else [that] need[s] [to] be said . . . ."

[41] We, of course, do not condone such conduct, by prosecutors or any other attorneys, and we acknowledge that, depending on its severity, conduct of the sort alleged by the defendant could result in a new trial, disciplinary sanctions against the attorney or both. In the present case, however, the record is insufficient to support the defendant's allegations against the state's attorney.

[42] The defendant also refers to certain of the state's attorney's comments, made in response to defense counsel's argument concerning the kidnapping charge, that relate only to that charge. Although we do not believe that those comments were improper, we need not address them in light of our conclusion that the defendant is entitled to a new trial on the kidnapping count.

diversion intended to distract attention from the real issue . . . ." Webster's Third New International Dictionary. Our review of the challenged portion of the state's attorney's argument reveals that it refers to several points made by defense counsel that reasonably may be characterized as peripheral, inconclusive or unimportant. Thus, the use of the term "red herring" was not unfair. Although the term "smoke screen" is more problematic because it may be viewed as connoting an intent to deceive; see id. (defining "smoke screen" as "something designed to obscure, confuse, or mislead"); we cannot say that the use of that term, which was isolated, rises to the level of an impropriety.

3

The defendant further contends that the state's attorney engaged in the excessive use of leading questions. In support of his claim, the defendant points to numerous instances in which the state's attorney posed leading questions to the victim, the victim's mother and Gary Albert, a security guard who was assigned to the Stamford train station on the night the victim was accosted there. We also reject this claim of impropriety.

Leading questions generally are inappropriate on direct or redirect examination of a witness, although the court has discretion to allow them in certain circumstances. See Conn. Code Evid. § 6-8 (b). Under § 6-8 (b) (3) of the Connecticut Code of Evidence, the court may permit leading questions when they are "necessary to develop a witness' testimony . . . ." The commentary accompanying § 6-8 (b) (3) of the Connecticut Code of Evidence explains that, under that exception, the court "may allow the calling party to put leading questions to a young witness who is apprehensive or reticent" or "to a witness who has trouble communicating, by virtue of either a disability or language deficiency . . . ." (Citation omitted.) Conn. Code Evid. § 6-8 (b), commentary.

The victim and Albert each fall into one of these exceptions to the prohibition against leading questions. The record reveals that the victim, who was sixteen years old at the time of trial, was nervous and spoke very softly when testifying. Her uneasy and reticent demeanor prompted the court to reassure her repeatedly that there was nothing to be nervous about and that she should relax and speak louder. In permitting the state's attorney to use leading questions in his examination of the victim, the court explained that it was "obligated to take into consideration the age of the witness, the demeanor of the witness and her current physical and emotional condition in terms of the leeway that I have allowed the state's attorney . . . . "

As to Albert, the record reveals that his native language is French and that he had substantial difficulty testifying in English. The court therefore agreed to allow the state's attorney a measure of leeway in his questioning of Albert, stating: "I [the court] had no idea what [Albert] was saying. So the jury must not have any idea what he's saying." The trial court acted well within its discretion in permitting the state's attorney to put leading questions to the victim and to Albert.

Our review of the record indicates that certain questions posed by the state's attorney to the victim's mother were leading. In each such instance, however, the trial court sustained defense counsel's objection to the leading question, and, as a result, any answer that the victim's mother had given to these questions was stricken. The defendant has provided no reason, and we are aware of none, why the questions themselves were so prejudicial or harmful as to render the trial unfair. Consequently, the defendant's claim must fail.

4

The defendant's next claim is that the state's attorney's cross-examination of the sole defense witness,

Deborah Dahlgren, was improper because his questioning was unduly sarcastic and repetitive. The defendant further contends that the state's attorney's conduct vis-á-vis Dahlgren was intended to prejudice the jury against her and to convey the state's attorney's belief that Dahlgren was untruthful. Although a close call, we agree that portions of the state's attorney's cross-examination of Dahlgren were improper.

The following additional procedural history is necessary to our evaluation of the defendant's claim. At trial, the defendant sought to establish that he was intoxicated when he attacked the victim and, therefore, that he could not have formed the specific intent necessary to commit either the crime of kidnapping or the crime of unlawful restraint. In support of his claim of intoxication, the defendant presented the testimony of Dahlgren, a casual acquaintance who knew the defendant because the two had frequented the same swimming pool and health club. Dahlgren had been identified and located by the defense, with the assistance of the defendant's mother, on the evening before she testified, and she was not disclosed as a witness until the day of her testimony. To some degree, she was a reluctant witness. Dahlgren testified, in essence, that she had seen the defendant at the pool on the evening in question and that he was highly intoxicated. She further testified that she recalled observing the defendant in that condition on the night in question because there had been a holiday party at the pool that evening, and because the defendant repeatedly had asked her for cigarettes.

The defendant challenges the propriety of the state's attorney's use of sarcasm during his cross-examination of Dahlgren. The defendant refers to several examples of the state's attorney's use of the device: (1) the state's attorney asked Dahlgren whether she was "certified in giving roadside . . . eye tests" as a follow-up to her testimony that she believed that the defendant had been

intoxicated that evening based on, inter alia, how his eyes appeared; (2) he referred to Dahlgren's memory of the defendant's demeanor that evening as "miraculous"; and (3) he commented, in response to Dahlgren's testimony that she did not remember when she first met the defendant, "That's what I thought." The defendant further maintains that the state's attorney's repeated questioning of Dahlgren as to how she possibly could have remembered that the defendant was at the pool that evening[43] and whether she had been coached about

---

[43] The defendant directs us to the following exchange between the state's attorney and Dahlgren:

"Q. You can remember this person from a year—over a year ago asking for cigarettes?

"A. He asked for a cigarette that night.

"Q. He did?

"A. All the time.

"Q. And you can remember that night specifically?

"A. Yeah.

"Q. Where did you write it down?

"A. I don't need to write it down.

"Q. You don't need to?

"A. Uh-huh . . . .

"Q. You didn't write it in a journal?

"A. No.

"Q. Palm pilot?

"A. No.

"Q. Calendar?

"A. No.

"Q. You can specifically remember a—

"A. I remember, yes, I remember.

"Q. You can specifically remember—

"A. I remember that totally—

"Q. Can I finish my question?

"A. Sure.

"Q. You can specifically remember a person at a pool party asking you for a cigarette fourteen months ago?

"A. Yes, because he always asked me for cigarettes.
* * *
"Q. And how many people asked you for cigarettes?

"A. Just him.

"Q. Just him out of 200 people? And you could specifically remember that?

"A. A lot of people don't smoke anymore. I don't even smoke that much.
* * *
"Q. And what time did he ask you for this cigarette?

"A. All night he was taking them.

her testimony[44] was designed to convey to the jury that the state's attorney personally did not believe Dahlgren's testimony. Finally, the defendant contends that it was improper for the state's attorney to ask Dahlgren whether the defendant had told her "that he was planning to go out and rob [some]body that night" because the state's attorney lacked a good faith basis to ask that question.[45]

The defendant contends that the state's attorney's questioning of Dahlgren was improper because his

---

"Q. Really?

"A. Yes.

"Q. Did you ever tell him to go get your own pack?

"A. I did.

"Q. And how many cigarettes did he ask for?

"A. Seven or eight, and then I left them on the table, and I think he took a couple more.

"Q. And you can remember this from . . . fourteen months ago?

"A. Yes, because I find that to be very annoying."

[44] The defendant relies primarily on the following colloquy between the state's attorney and Dahlgren:

"Q. And the [defendant's] mother obviously told you what to say, right?

"A. Well, no.

"Q. Well, no?

"A. I'm just winging it. I mean, you're asking me questions and I'm answering as best as I [can].

              \* \* \*

"Q. And the [defendant's] mother didn't tell you what to say here, right?

"A. No.

"Q. And the defense attorney didn't tell you what to say?

"A. No.

"Q. And no one told—no one went over your—

"A. Sir, this is what happened. I'm telling you the God's honest truth.

"Q. No one went over your testimony before—

"A. No.

"Q. Today?

"A. No.

"Q. Today is the first time you're doing this?

"A. This is the first time.

              \* \* \*

"Q. And no one helped you with your testimony coming in here today?

"A. No."

[45] We note that the trial court sustained defense counsel's objection to this question.

intent was not to elicit testimony from Dahlgren but, rather, to mock and belittle her. As we previously have observed, a prosecutor may not seek to sway the jury by unfair appeals to emotion and prejudice; see, e.g., *State* v. *Rizzo*, 266 Conn. 171, 255, 833 A.2d 363 (2003); and we have recognized that the excessive use of sarcasm may improperly influence a jury. See id., 263–64. A prosecutor's frequent and gratuitous use of sarcasm can "[call on] the jurors' feelings of disdain, and likely sen[d] them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method of argument [is] permissible and appropriate for them to use." Id. A prosecutor should conduct his examination of a witness fairly, objectively and with decorum, and he should not ridicule or browbeat a witness. See ABA Standards for Criminal Justice, supra, standard 3-5.7 (a), p. 103. Moreover, a "prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 363; see also B. Gershman, supra, § 11:21, p. 497. Finally, as we previously noted, a prosecutor is not permitted to pose a question that implies the existence of a factual predicate when the prosecutor knows that no such factual basis exists.

We conclude that the foregoing portions of the state's attorney's cross-examination of Dahlgren, when considered together, ran afoul of these proscriptions.[46] Specifically, his gratuitous use of sarcasm and repeated questioning of Dahlgren as to matters that he already had explored thoroughly with her were intended to convey to the jury the state's attorney's own belief that Dahlgren was not a credible witness. Furthermore, there is no indication that the state's attorney had a good faith belief that the defendant told Dahlgren that

---

[46] Indeed, the state concedes that at least some of the state's attorney's questions were improper.

he intended to rob someone on the evening that the victim was assaulted.

5

The defendant further claims that the state's attorney improperly referred to facts not in evidence during closing argument. We disagree.

The following facts are relevant to this claim. In questioning the victim's mother, the state's attorney asked her why the victim would not discuss the incident at the train station. The victim's mother responded: "[S]he told me she didn't want to talk to me right now. She did not want to relive that incident." Defense counsel objected to the testimony insofar as it purported to explain why the victim was unwilling to discuss the incident, and the trial court sustained the objection. The defendant now claims that the state's attorney should not have referred to this testimony in his closing argument.

Of course, it is improper for a prosecutor, in his closing argument, to refer to evidence that has been stricken or ruled inadmissible. See, e.g., *State* v. *Oliveras*, 210 Conn. 751, 763, 557 A.2d 534 (1989). In the present case, however, on cross-examination of the victim's mother, defense counsel elicited virtually the same testimony. Specifically, in response to defense counsel's question as to whether the victim had been willing to get counseling, the victim's mother replied: "She was unwilling because she did not want to relive the incident. She didn't want to go through it. She did not want to confide in anyone about it." Because this testimony of the victim's mother was properly before the jury, the state's attorney's reference to the substance of that testimony in closing argument was proper.

B

Having concluded that some of the state's attorney's conduct at trial was improper, we now must determine

whether those improprieties were so harmful as to deprive the defendant of a fair trial. In doing so, we apply the factors enumerated by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), which include: "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Bell*, supra, 283 Conn. 781.

In addition, "[a]lthough a defendant's failure to object to improprieties does not preclude review of his claims . . . [w]hen defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . . [T]he fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Citation omitted; internal quotation marks omitted.) Id., 782. The defendant did object and move for a mistrial following the state's attorney's inquiry of the victim as to whether the defendant had gotten into her underclothing. Much of the state's attorney's cross-examination of Dahlgren that the defendant challenges on appeal, however, was not the subject of a contemporaneous objection. To the extent that defense counsel failed to raise an objection, that fact weighs against the defendant's claim that the improper conduct was harmful.

As to the first *Williams* factor, the state's attorney's conduct that we have concluded was improper was not invited by the defense. Defense counsel sought to

preclude all references to and testimony about any attempted sexual assault, and he objected, and then moved for a mistrial, when the state's attorney sought to pursue that line of inquiry. With respect to the state's attorney's unduly sarcastic and repetitive questioning of Dahlgren, those improprieties also were not invited by the defense.[47]

With respect to the second and third *Williams* factors, the improprieties were not particularly severe or frequent when viewed in the context of the entire trial, which spanned several days and included eleven witnesses. See, e.g., *State* v. *James G.*, 268 Conn. 382, 419, 844 A.2d 810 (2004) (in examining claim of prosecutorial impropriety, prosecutor's conduct must be viewed in broader context of entire trial). With respect to the state's attorney's improper questioning of the victim about whether the defendant had attempted to "get into" her underclothing, that questioning was brief and isolated, and the trial court immediately sustained defense counsel's objection to that inquiry. Furthermore, the victim and at least two other witnesses testified as to the victim's belief that the defendant had been trying to rape her, and a statement that the police had taken from the victim immediately after the incident, which was admitted into evidence, also reflected the victim's belief as to the defendant's motivation in that regard. Finally, although improper, the state's attorney's unduly sarcastic and repetitive questioning of Dahlgren was neither egregious nor representative of a pattern of similar conduct throughout the trial.

---

[47] We do note, however, that the state's attorney objected vigorously to the defendant's use of Dahlgren as a witness, characterizing her last minute disclosure as a "surprise" and a "complete ambush . . . ." The state's attorney further complained that he did not know what Dahlgren would be testifying about and that he had been unable to prepare any questions for her. The state's attorney therefore requested that the court afford him latitude in questioning Dahlgren, and the court agreed that some leeway was appropriate under the circumstances.

With respect to the factor of curative measures, the court, immediately following the victim's testimony, instructed the jury that the defendant had not been charged with sexual assault. "[W]e have recognized that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks or questions can obviate any possible harm to the defendant." (Internal quotation marks omitted.) Id., 420. The court's curative instruction, therefore, militates against the defendant's claim that he is entitled to a new trial on due process grounds.

Finally, although Dahlgren's testimony was relevant to a central issue in the case, namely, the defendant's intent, the state's case against the defendant was strong. The defendant did not contest the state's proof that he had accosted the victim at the train station and did not dispute the essential facts relating to that altercation. Rather, the defendant attempted to demonstrate that he had been so intoxicated when he assaulted the victim that he lacked the specific intent necessary to commit the crime of kidnapping or of unlawful restraint. The evidence that the state adduced, however, strongly contradicted the defendant's claim. For example, two Metropolitan Transit Authority officers who were present when the defendant was apprehended shortly after the incident testified that the defendant did not appear to be intoxicated. In addition, an emergency room record documenting medical treatment that the defendant received for a twisted ankle that he suffered while running from the scene of the alleged assault of the victim does not indicate that the defendant had been intoxicated. Finally, it was apparent from her testimony that Dahlgren was not particularly friendly with or close to the defendant, a fact that minimized the effect of the state's attorney's efforts, some of which were improper, to undermine Dahlgren's credibility.

Upon consideration of the relevant factors, we are satisfied that the several instances of prosecutorial

impropriety that the defendant has identified did not implicate the fairness of his trial. Accordingly, we reject the defendant's claim that his due process rights were violated by the state's attorney's improper conduct.[48]

### III

The defendant's final claim is that the trial court improperly instructed the jury with respect to the offense of unlawful restraint in the first degree, thereby entitling him to a new trial on that charge. We disagree that the trial court's instructions were inadequate.[49]

---

[48] The defendant alternatively claims that, even if we conclude that the claimed prosecutorial improprieties do not rise to the level of a due process violation, we nevertheless should reverse the trial court's judgment under our supervisory powers. "We previously have held that we may invoke our inherent supervisory authority in cases in which prosecutorial [impropriety] is not so egregious as to implicate the defendant's . . . right to a fair trial . . . [but] when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . We have cautioned, however, that [s]uch a sanction generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal. . . . Accordingly, in cases in which prosecutorial [impropriety] does not rise to the level of a constitutional violation, we will exercise our supervisory authority to reverse an otherwise lawful conviction only when the drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial [impropriety] in the future." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, supra, 268 Conn. 422–23. Because the improper conduct in the present case was neither egregious nor representative of a pattern of deliberate misconduct, we reject the defendant's supervisory authority claim.

[49] Because the defendant did not preserve this claim at trial, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), pursuant to which "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. Although the record is adequate for our review of the defendant's unpreserved constitutional claim, we conclude that the defendant has failed to demonstrate a constitutional violation.

The following additional facts are necessary to our resolution of the defendant's claim. The trial court commenced its jury instructions with certain general principles. In that initial portion of its charge, the court defined "intent" in relevant part: "As defined by statute, a person acts intentionally with respect to [a] result or conduct when the conscious objective is to engage in such conduct."[50] Because unlawful restraint in the first degree is a specific intent crime; e.g., *State* v. *Youngs*, 97 Conn. App. 348, 363, 904 A.2d 1240, cert. denied, 280 Conn. 930, 909 A.2d 959 (2006); the trial court also instructed the jury that it must consider whether the defendant was intoxicated when the crime was committed and, if so, whether his intoxication rendered him unable to form the specific intent required for conviction of that offense.[51] The court then turned to the elements of each of the crimes charged. In its instructions

[50] The trial court instructed the jury on intent as follows: "What I'd like to do now is discuss with you a concept or definition which is critical and integral to your understanding and analysis of the elements or parts of some of the crimes charged.

"That concept or definition, if you will, is that of intent. The word intent, what does it mean and how do you determine intent?

"Intent relates to the condition of mind [of one] who commits an act, his purpose in doing the act. As defined by statute, a person acts intentionally with respect to [a] result or conduct when the conscious objective is to engage in such conduct.

"Now, what a person's purpose or intent has been usually is to be determined by inference by you. Nobody is able to look into another's mind and see a specific intent. The only way a jury can ordinarily determine what a person's purpose was or intent was other than from that person's own statements and testimony is by determining what the conduct was and what the circumstances were surrounding the conduct. And, of course, from that, you may infer the intent or purpose. To draw such an inference is not only your purpose but your proper function as members of the jury."

[51] The trial court instructed the jury as follows on the issue of the defendant's alleged intoxication: "If you find the defendant was intoxicated at the time of the crimes, you may take that fact into consideration in determining whether he was in such a state of intoxication as to be incapable of forming the required specific intent which is the necessary element for the commission of the crimes of kidnapping and unlawful restraint.

"However, if you believe the defendant, although intoxicated, was still capable of possessing a specific criminal intent, then his responsibility is the same as if he were not intoxicated."

on unlawful restraint in the first degree, the trial court repeated the definition of the term "restraint" that it previously had provided the jury in its instructions on kidnapping in the second degree. In particular, the court explained that "[r]estraint, as we just discussed, means to restrict a person's movements intentionally and unlawfully in such a manner so as to substantially interfere with her liberty by confining her without her consent."[52]

The defendant claims that the trial court's instructions were flawed because the court's definition of the term "intent" was incomplete and, therefore, inaccurate. In support of this contention, the defendant relies on General Statutes § 53a-3 (11), which provides that "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is *to cause such result or to engage in such conduct . . . .*" (Emphasis added.) The defendant further contends that the court's improper definition of intent rendered the instructions

---

[52] The trial court instructed the jury on unlawful restraint in the first degree as follows: "Under the second count, the defendant is charged with unlawful restraint in the first degree. In that regard, our Penal Code provides that a person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose that other person to a substantial risk of physical injury.

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: one, that the defendant restrained the victim; and two, that the restraint exposed the victim to a substantial risk of physical injury.

"Restraint, as we just discussed, means to restrict a person's movements intentionally and unlawfully in such a manner so as to substantially interfere with her liberty by confining her without her consent.

"The state must also prove beyond a reasonable doubt that the defendant restrained the victim under circumstances that exposed the victim to a substantial risk of physical injury. Physical injury means the impairment of physical condition or pain. That's what it means, the impairment of physical condition or pain. A substantial risk of physical injury means considerable risk of physical injury.

"So, in summary once again, the state must prove beyond a reasonable doubt that the defendant restrained the victim and that such restraint exposed the victim to a substantial risk of physical injury."

constitutionally deficient because it misled the jury to believe that it could find the defendant guilty of unlawful restraint in the first degree based simply on proof that he had "intend[ed] to engage in the conduct of grabbing [the victim] regardless of whether or not he intended to restrain [and] confine . . . her." In other words, the defendant claims that the court's charge effectively eliminated the specific intent element of unlawful restraint.

The state concedes that the trial court's definition of "intent" was incomplete because the court failed to explain the term in accordance with the statutory definition. Because the court's definition of intent did not contain the phrase "to cause such result," that definition focused solely on the concept of general intent—that is, an intent to engage in certain conduct—and not on the concept of specific intent—that is, an intent to bring about a certain result. "When the elements of a crime consist of a description of a particular act and a mental element not specific in nature, the only issue is whether the defendant intended to do the proscribed act. If he did so intend, he has the requisite general intent for culpability. When the elements of a crime include a defendant's intent to achieve some result additional to the act, the additional language distinguishes the crime from those of general intent and makes it one requiring a specific intent." *State* v. *Bitting*, 162 Conn. 1, 5, 291 A.2d 240 (1971). Because, as we have explained, unlawful restraint is a specific intent crime, the court's definition of intent, standing alone, was inaccurate for purposes of the present case.

"When reviewing [a] challenged jury instruction . . . [however] we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon

legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect [on] the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Heinemann*, 282 Conn. 281, 300, 920 A.2d 278 (2007).

Applying the foregoing standards, we conclude that it is not reasonably possible that the jury was misled by the court's incomplete definition of intent because the court thereafter accurately explained that, to prove the element of "restraint," the state was required to establish that the defendant had restricted the victim's movements *"intentionally and unlawfully* in such a manner so as to interfere substantially with her liberty by confining her without her consent." (Emphasis added.) Under this explanation, there is no reasonable possibility that the jury could have found the defendant guilty of unlawful restraint unless it first had found that he had restricted the victim's movements with the intent to interfere substantially with her liberty. In other

words, because "restraint" is itself defined in terms that include the requirement of a specific intent, and because the trial court properly instructed the jury on that definition, the defendant was not prejudiced by the trial court's failure to define "intent" in full compliance with § 53a-3 (11). We also note that the trial court, in its explanation of the defendant's claim of intoxication, referred expressly to the "specific intent" necessary for the commission of the offense of unlawful restraint in the first degree. See footnote 51 of this opinion. Finally, during closing arguments, both the state's attorney and defense counsel addressed the unlawful restraint charge in terms wholly consistent with its requirement of a specific intent, a fact that further undermines the defendant's claim that the jury likely was confused by the court's incomplete definition of intent. We conclude, therefore, that the defendant has failed to demonstrate that the trial court's instructions, when viewed in the aggregate, were misleading.

The judgment is reversed only as to the conviction of kidnapping in the second degree and the case is remanded for a new trial on that count. The judgment is affirmed in all other respects.

In this opinion BORDEN, NORCOTT and KATZ, Js., concurred.

BORDEN, J., concurring. I agree with and join the majority opinion. I write separately and briefly to underscore two points.

First, I note that this case presents the same question that I raised in my concurrence in *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 414–19, 891 A.2d 959 (2006), regarding the constitutionality, under the separation of powers doctrine, of General Statutes § 1-2z. In the present case, the majority finds an ambiguity in the legislature's use of two somewhat linguistically

different phrases to define the requisite intent for abduction and restraint, respectively. That is, the intent necessary for an abduction is an intent "to prevent [a person's] liberation"; General Statutes § 53a-91 (2); and the intent necessary for a restraint is the intent "to interfere substantially with [a person's] liberty . . . ." General Statutes § 53a-91 (1). It is that ambiguity that permits the majority to go beyond the literal language of the kidnapping statute, and to delve into its historical background and other nontextual sources to conclude that the legislature did not intend that a conviction for kidnapping would lie when the kidnapping is merely incidental to an underlying crime. Although I would readily conclude that the two phrasings in all probability mean the same thing, it is—barely—plausible that they could have different meanings (although I am hard pressed to say what that difference is), because they do use somewhat different words. See *Felician Sisters of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008) ("use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" [internal quotation marks omitted]). Nonetheless, as in *Kinsey*, this is a slim but adequate reed on which to base a finding of ambiguity. *Kinsey* v. *Pacific Employers Ins. Co.*, supra, 415 (*Borden, J.*, concurring). That slim reed does again, however, bring to mind the serious question of the constitutionality of § 1-2z that I outlined in *Kinsey*, since, without it, the majority would be barred by § 1-2z from relying on the legislative history and likely would be compelled to arrive at a different answer. Id., 416.

Second, because I joined the majority in *State* v. *Luurtsema*, 262 Conn. 179, 811 A.2d 223 (2002), in which this court affirmed a kidnapping conviction that, under the new standard articulated by the majority in the

present case, would in all likelihood be required to be reversed, and because I issued a separate concurrence in that case urging that challenges to kidnapping convictions on the basis of slight degrees of detention be confined to challenges for vagueness; id., 205; I think it is incumbent on me to state why I have changed my mind and now join the majority in the present case. Briefly stated, I am persuaded by the majority opinion's insight that, in establishing our prior kidnapping jurisprudence, this court never fully analyzed the kidnapping statute, its historical background, and the anomalous results that our jurisprudence was producing. In light of that analysis, which the majority has now produced, I am convinced that, in enacting the kidnapping statutes, the legislature did not intend that almost every assault, sexual assault or robbery automatically would be elevated to a kidnapping, with its attendant heavy penalties and opportunities for prosecutorial overcharging, simply by virtue of a minor restraint of liberty that was inherent in the underlying crime. Such a result now strikes me, not simply as "counterintuitive"; id., 204 (*Borden, J.,* concurring); but as anomalous and not consistent with the likely legislative intent. It is time that we join the great majority of courts that have so concluded, as the majority has aptly demonstrated.

ZARELLA, J., with whom VERTEFEUILLE and SULLIVAN, Js., join, concurring in part and dissenting in part. I disagree with the new interpretation of our kidnapping statutes that the majority announces in part I of its opinion and with its conclusion in part III that unlawful restraint is a specific intent crime.[1] My disagreement with the majority is premised on what I believe to be serious flaws in its construction of the plain language of the statutory scheme, its treatment of the principle of stare decisis, and its usurpation of

---

[1] I agree with the majority's conclusion in part II that the prosecutorial improprieties did not entitle the defendant, Scott Salamon, to a new trial.

the roles of both the legislature and the office of the state's attorney set forth in our state constitution. I agree, however, with the majority's conclusion that the defendant, Scott Salamon, is entitled to a new trial on the charge of kidnapping in the second degree, albeit for a different reason. I therefore would remand the case for a new trial on that charge and direct the trial court to instruct the jury on the crime of kidnapping consistent with my analysis that follows. Accordingly, I concur in the result.

## I

The majority identifies two concerns pertaining to the crime of kidnapping. First, it is troubled by the potential for defendants to be charged with this severe crime in situations where the restraint of the victim is incidental to the commission of some underlying assault-type crime.[2] Second, the majority is unable to distinguish clearly the crime of unlawful restraint from that of kidnapping. The majority's ultimate conclusion, however, fails to address the latter issue at all and, in addressing the former, overrules this court's past precedent and overlooks the clear language of the statute defining the specific intent necessary for kidnapping. To address these concerns, the majority announces today, and for the first time, that the statutory scheme governing the crimes of unlawful restraint and kidnapping is ambiguous. This claimed ambiguity is premised on the majority's conclusion that the language of the statute fails, in light of the significant difference in the penalties for the two crimes, to distinguish adequately between an unlawful restraint and a kidnapping.

---

[2] I use "assault-type crime" to describe the category of offenses that the majority views as requiring some restraint of the victim in order to perpetrate and, thus, as having the potential to give rise to a charge of kidnapping in addition to or in lieu of a charge for the commission of the underlying crime. For example, such crimes include, but are not limited to, assault, robbery and sexual assault.

Relying on this ambiguity, the majority then engages in an unnecessary investigation into extratextual evidence to ascertain the original intent of our legislature and concludes that, for more than thirty years, this court has misinterpreted the crime of kidnapping. I disagree with this reading of the statutory scheme and conclude that the plain language of General Statutes § 53a-91 defining "restrain" and "abduct" clearly distinguishes the two crimes and their different elements. Indeed, even if it is proper to look to extratextual evidence, that evidence does not support the majority's position.

As a preliminary matter, and before explaining my analysis of § 53a-91 et seq., I note my agreement with the majority's observation that our prior case law in this area has not included an in-depth discussion of the distinctions between unlawful restraint and kidnapping, specifically, of the critical difference between the mental states required to commit these crimes. That analysis is one, however, that, to the best of my knowledge, none of our prior cases required us to conduct. I agree with the majority that this case warrants further textual analysis of the statutory scheme governing these crimes. Unlike the conclusion advocated by the majority, however, the construction I advance is clearly supported by the text of the statutes and is consistent with our long line of precedent, correctly identifying that, for a defendant to be found guilty of kidnapping, the jury must find that he possessed the *necessary intent.*

Because I conclude that the crimes of kidnapping and unlawful restraint require the state to prove that the defendant possessed separate and distinct mental states, a brief discussion of criminal intent in statutory crimes is useful. At common law, it was axiomatic that criminal acts required "the coupling of the evil-meaning mind with the evil-doing hand . . . ." *State* v. *Gabriel,* 192 Conn. 405, 412, 473 A.2d 300 (1984); see also 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) pp.

8–9 (criminal conduct encompasses both act and state of mind that defines crime). Notwithstanding this common-law requirement, we have recognized that the legislature may enact a statutory crime for which culpability requires either "that one [merely] do the proscribed act, that one do the act with general intent, or that one do the act with specific intent." *State* v. *Bitting*, 162 Conn. 1, 5, 291 A.2d 240 (1971). In ascertaining whether the legislature intended conduct alone to be criminal—that is, subject to strict liability—or intended that criminality also require general or specific intent, we have stated that the legislature's choice in language is "significant." Id. Furthermore, to determine what mental state is required for a particular crime, we have observed that, "[w]hen the elements of a crime consist of a description of a particular act and a mental element not specific in nature, the only issue is whether the defendant intended to do the proscribed act. If he did so intend, he has the requisite general intent for culpability. When the elements of a crime include a defendant's intent to achieve some result additional to the act, the additional language distinguishes the crime from those of general intent and makes it one requiring a specific intent." Id.

To clarify the distinction between the crimes of unlawful restraint and kidnapping, I must begin, as with all statutory analysis, with the text of the relevant statutes read in the context of the legislative scheme. See General Statutes § 1-2z. The crime of unlawful restraint in the first degree, a class D felony, is defined by General Statutes § 53a-95 (a), which provides that "[a] person is guilty of unlawful restraint in the first degree when he *restrains* another person under circumstances which *expose such other person to a substantial risk of physical injury.*" (Emphasis added.) The crime of kidnapping in the second degree, a class B felony, is defined in General Statutes § 53a-94 (a), which provides that "[a]

person is guilty of kidnapping in the second degree when he *abducts* another person." (Emphasis added.) Thus, when one looks solely at the text defining the two crimes, the principal difference between them is plain. To understand how unlawful restraint differs from kidnapping, it is necessary to distinguish a defendant's "restraint" of a victim in one case from "abduction" in another. Section 53a-91 defines these terms and is, therefore, the proper focus for an analysis of the substantive distinction between the two crimes.

General Statutes § 53a-91 (1) provides in relevant part: " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him . . . without consent. . . ." The act necessary to commit restraint is clear. The defendant must "restrict a person's movements" by "moving him" or "confining him . . . ." General Statutes § 53a-91 (1). Additionally, the legislature has chosen to specify a mental state. Therefore, restraint is clearly not conduct subject to strict liability. Rather, the proscribed act of restricting must be done "intentionally and unlawfully," which clearly excludes reckless or negligent restriction of another's movements from the purview of criminal restraint. General Statutes § 53a-91 (1). Thus, I conclude, unlike the majority, that the statute's text requires that the defendant act with only general intent.[3]

---

[3] My research has not revealed extensive discussion in our case law distinguishing characteristics of strict liability, general intent and specific intent crimes. I note, however, that our case law, for example, has characterized the following crimes as general intent: (1) sexual assault in the second degree under General Statutes § 53a-71 (a) (1); e.g., *State* v. *Sorabella*, 277 Conn. 155, 169, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006); (2) risk of injury to a child under General Statutes § 53-21; e.g., id., 172–73; (3) manslaughter in the second degree under § 53a-56; see *State* v. *Salz*, 226 Conn. 20, 28 n.5, 627 A.2d 862 (1993) (distinguishing general intent crime of manslaughter in second degree, which requires that defendant act either "recklessly" or "intentionally," from specific intent crime of murder under § 53a-54a); (4) sexual assault in the first degree under

The "proscribed act," namely, the restriction of another person's movements, must be done intentionally, but the statute does not define a specific "intent to achieve some result additional to the act . . . ."[4] *State* v. *Bitting*, supra, 162 Conn. 5. The statute, however, does define the degree or extent of restriction that a defendant must perpetrate to accomplish a restraint. The criminal actor must "restrict a person's movements . . . in such a manner as to interfere substantially with [the victim's] liberty . . . ." General Statutes § 53a-91

General Statutes § 53a-70. E.g., *State* v. *Smith*, 210 Conn. 132, 136, 554 A.2d 713 (1989).

Furthermore, many of these crimes expose a defendant convicted of them to comparable or greater punishment than that prescribed by the unlawful restraint statutes. I suggest, therefore, that we cannot look to the legislature's choice of punishment as an indicator of whether the crime requires an element of specific intent or merely general intent but must look to the language of the statute, in accordance with *State* v. *Bitting*, supra, 162 Conn. 5, to ascertain the legislature's intent. See General Statutes § 53a-71 (class B or C felony); General Statutes § 53-21 (class B or C felony); General Statutes § 53a-56 (class C felony); General Statutes § 53a-70 (class A or B felony).

[4] My conclusion necessitates addressing a prior case in which this court observed, with little analysis, that the legislature's use of the word "intentionally" in a statute renders the crime a specific intent crime pursuant to General Statutes § 53a-5. *State* v. *Shaw*, 186 Conn. 45, 53, 438 A.2d 872 (1982). I disagree with this observation in *Shaw*, which is inconsistent not only with the plain language of § 53a-5 but also with our precedent recognizing both general intent and specific intent crimes.

General Statutes § 53a-5 provides in relevant part: "When the commission of an offense defined in . . . title [53a], or some element of an offense, requires a particular mental state, such mental state is ordinarily designated in the statute defining the offense by use of the terms 'intentionally', 'knowingly', 'recklessly' or 'criminal negligence', or by use of terms, such as 'with intent to defraud' and 'knowing it to be false', describing a *specific kind of intent or knowledge. . . .*" (Emphasis added.) The statute does not indicate that the use of these words defines specific intent crimes; rather, it denotes the words that the legislature is likely to use to communicate the mental state required for any particular crime. Additionally, our case law does not support the conclusion that the presence of one or more of these enumerated words or phrases indicates a specific intent crime. See, e.g., *State* v. *Shine*, 193 Conn. 632, 637–39, 479 A.2d 218 (1984) (categorizing certain statutory crimes requiring "recklessness" as general intent crimes).

(1). Therefore, a jury faced with determining whether a defendant has committed an unlawful restraint must decide whether the state has proven beyond a reasonable doubt that the defendant acted (1) intentionally and unlawfully (2) to restrict the victim's movement, (3) that the restriction amounted to a substantial interference with the victim's liberty, and (4) that the restriction was accomplished without the victim's consent.[5]

The term "abduct," as defined by § 53a-91 (2), builds on the definition of "restrain." The statute provides that " '[a]bduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2). To find a defendant guilty of kidnapping, therefore, a jury must find that the state has proven beyond a reasonable doubt all of the elements of a restraint, outlined previously, *plus* that the defendant accomplished a restraint *"with intent to prevent [the victim's] liberation by . . . using or threatening to use physical force or intimidation."* (Emphasis added.) General Statutes § 53a-91 (2); see also Commission to Revise the Criminal Statutes, Connecticut Penal Code Comments (1971) § 53a-91, p. 30, reprinted in 28A Conn. Gen. Stat. Ann. § 53a-91 (West 2007) p. 423 (noting abduction involves *restraint plus intent* to secrete victim or to threaten or use physical force); D. Borden & L. Orland, 10 Connecticut Practice Series: Connecticut Criminal Law (2d Ed. 2007) p. 181 ("an abduction requires a restraint, as defined by . . . § 53a-91 [1] *plus the requisite intent* defined by . . . § 53a-91 [2]" [emphasis added]). Unlike the definition of "restrain," which requires that the defendant merely intend to do an act, that is, to restrain the victim's

---

[5] I note that the statute does not further define a substantial interference. Whether the restriction of movement rises to the level of a substantial interference with the victim's liberty is a factual question for the jury.

movement, the definition of "abduct" requires additional proof that the defendant act with "intent to achieve some result additional to the act [of restraining] . . . ." *State* v. *Bitting,* supra, 162 Conn. 5. Specifically, the legislature has specified that the crime of kidnapping requires *additional proof* that the defendant act *with intent to prevent the victim's liberation by specific means.* See, e.g., *State* v. *Luurtsema,* 262 Conn. 179, 201, 811 A.2d 223 (2002) (including "use of physical force" in statement of requisite intent for kidnapping); *State* v. *Vass,* 191 Conn. 604, 618, 469 A.2d 767 (1983) ("use of force, threat of force or intimidation" sufficient to satisfy requisite intent for crime of kidnapping); *State* v. *Bell,* 188 Conn. 406, 415–16, 450 A.2d 356 (1982) (same); see also Commission to Revise the Criminal Statutes, supra, § 53a-91, p. 30 (noting abduction involves restraint *plus intent* to secrete victim or to threaten or use physical force). Thus, kidnapping is a specific intent crime, and this additional intent element distinguishes kidnapping not only from unlawful restraint but also from other crimes that may involve restraint of the victim.

The majority's failure to recognize this significant distinction is the product of its misreading of the intent elements of "restrain" and "abduct." The majority describes the intent necessary to restrain a victim, as "the intent to interfere substantially with that person's liberty . . . ." Footnote 28 of the majority opinion. This is not a precise reading of the statute and is not supported by the legislature's choice of language. Unlike the language used to define "abduct," the language used to define "restrain" does not require that a defendant restrict the victim's movements with "*the intent to* interfere substantially with that person's liberty"; (emphasis added) id.; but only that the defendant act "intentionally and unlawfully . . . ." General Statutes § 53a-91 (1).

The phrase "in such a manner as to interfere substantially with his liberty" in § 53a-91 (1) defines the point at which the defendant's intentional restriction of the victim becomes a criminal restraint.[6] The definition of "abduct" builds on the intentional act of restraint but

---

[6] The majority's reliance on the definition of "intentionally" set forth in General Statutes § 53a-3 (11) to support its conclusion that unlawful restraint is a specific intent crime is far from conclusive. That definitional provision defines both kinds of statutory intent—general and specific. *State* v. *McColl*, 74 Conn. App. 545, 575, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003); see also *State* v. *Austin*, 244 Conn. 226, 235–37, 710 A.2d 732 (1998); *State* v. *DeBarros*, 58 Conn. App. 673, 680–84, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000). To act with statutory "intent," a defendant must have the conscious objective to engage in proscribed conduct *or* have the conscious objective to cause a particular result. The majority contorts the plain language of § 53a-91 (1) to arrive at its conclusion that the proscribed conduct is "moving or confining the victim," and the intended result is substantial interference with the victim's liberty. Footnote 28 of the majority opinion. As previously discussed, I disagree with this reading of § 53a-91. Rather, the proscribed conduct is the restriction of the victim's movements, which must be accomplished through movement or confinement. Contrary to the majority's position, the statute does not dictate that the defendant have the specific intent to interfere substantially with the victim's liberty; it provides only that, to be a restraint, the restriction must be severe enough to so interfere.

Furthermore, the majority's understanding of § 53a-5 and its "directive"; id.; is not consistent with our case law. We repeatedly have recognized that, "when a statute requires the state to prove that the defendant *intentionally engaged* in the statutorily proscribed *conduct*, § 53a-5 does not require us to presume that the statute requires the state to prove that the defendant *had knowledge* of a *circumstance* described in the statute." (Emphasis in original.) *State* v. *Higgins*, 265 Conn. 35, 45, 826 A.2d 1126 (2003); see *State* v. *Denby*, 235 Conn. 477, 482–83, 668 A.2d 682 (1995). The majority criticizes my reading of § 53a-91 by noting that I would not apply the intent requirement to the fact that the restraint must be accomplished without the victim's consent for it to be unlawful. The majority fails to recognize, however, that lack of consent is a *factual circumstance* that must exist in order to render the proscribed conduct unlawful. This court has rejected an argument virtually identical to that now advanced by the majority that the defendant must have knowledge of the victim's lack of consent with respect to § 53a-70, sexual assault in the first degree, which is a general intent crime. *State* v. *Smith*, 210 Conn. 132, 136–40, 554 A.2d 713 (1989). I think it also is relevant to the majority's concerns to note that a defendant charged with unlawful restraint certainly may raise the defense of consent. As we recognized in *Smith*, "[a] finding that a complainant had consented would implicitly negate a claim" of unlawful restraint. Id., 140. Furthermore, the statutory scheme defining unlawful restraint and kidnapping does not make consent an affir-

additionally requires that the state prove that the defendant possessed a specific intent. In the definition of "abduct," the legislature employs the phrase *"with intent to"* to describe the requirement that the defendant must desire to achieve the additional result of

mative defense. Therefore, the defense of consent places the burden on "the state to prove lack of consent beyond a reasonable doubt whenever the issue is raised." Id.

My reading of the unlawful restraint statutes also is consistent with this court's interpretation of § 53-21 defining the *general intent* crime of risk of injury to a child. General Statutes § 53-21 (a) provides in relevant part that "[a]ny person who (1) *wilfully or unlawfully* causes or permits any child . . . to be placed in such a situation *that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired* . . . shall be guilty of a class C felony . . . ." (Emphasis added.) The language that the legislature employed in this statute to define the mental state required is "wilfully or unlawfully . . . ." General Statutes § 53-21 (a). Unlike "intentionally," "wilfully" is not a mental state referenced in § 53a-5 or otherwise defined by the definitional section of our criminal statutes. This court has concluded, however, that the legislature intends to require that the defendant's actions be "intentional" when it proscribes "wilful" conduct. *State* v. *Payne*, 240 Conn. 766, 774, 695 A.2d 525 (1997), overruled in part on other grounds by *State* v. *Romero*, 269 Conn. 481, 849 A.2d 760 (2004); see also *State* v. *Sorabella,* 277 Conn. 155, 173, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006). We have held, however, with respect to the risk of injury statute, that the requirement that the conduct be intentional does not apply to the effect of endangering the health or morals of a child. *State* v. *Sorabella,* supra, 173; see also *Allstate Ins. Co.* v. *Berube,* 84 Conn. App. 464, 470–71, 854 A.2d 53, cert. denied, 271 Conn. 929, 859 A.2d 583 (2004). To be consistent, the majority's position that § 53a-5 mandates that "intentionally," as used in § 53a-91 (1), applies to the effect "in such a manner as to interfere substantially with [the victim's] liberty"; General Statutes § 53a-91 (1); would also mandate that "wilfully," as used in § 53-21, apply to the effect "that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired . . . ." General Statutes § 53-21 (a) (1). This can only lead to the conclusion that the majority will apply this logic in the future to the risk of injury statute and thus find it to be a specific intent crime. Of course, in order to do so, the majority again will have to overrule a long of line of cases that has held otherwise and has not met with legislative disapproval.

Finally, the majority's view of § 53a-5 seems inconsistent with the Appellate Court's conclusion in *State* v. *Youngs,* 97 Conn. App. 348, 365, 904 A.2d 1240, cert. denied, 280 Conn. 930, 909 A.2d 959 (2006), that the intent requirement for unlawful restraint in the first degree does not apply to the element of that offense that requires the restraint to be perpetrated under circumstances that expose the victim to a substantial risk of physical injury.

preventing the victim's liberty by secreting him or using or threatening to use physical force or intimidation.[7] (Emphasis added.) General Statutes § 53a-91 (2).

Significantly, the legislature repeats this linguistic pattern of coupling "restrain" with a specific intent as indicated by the phrase "with intent to" in the statutory scheme, which further supports the conclusion that

[7] The majority also asserts that my conclusion that unlawful restraint is a general intent crime is "inconsistent" with this court's decision in *State* v. *Foster*, 202 Conn. 520, 522 A.2d 277 (1987), because, in that case, "we impliedly acknowledged that a restraint is unlawful if, and only if, a defendant's conscious objective in moving or confining the victim is to achieve that prohibited result, namely, to restrict the victim's movements in such a manner as to interfere substantially with his or her liberty." Footnote 28 of the majority opinion. I do not agree with the majority. In *Foster*, we did not analyze the language of § 53a-91 (1) or define the intent requirement for "restrain." We did, however, reject the defendant's contention that the trial court's instructions on the definition of "restrain" improperly led the jury to believe that the state did not need to prove that the defendant intended to interfere substantially with the victim's liberty. *State* v. *Foster*, supra, 539. The court did not affirmatively adopt this analysis of the requisite statutory intent. Instead, the court cited the trial court's instructions, which simply set forth the precise statutory definition of "restrain," and noted that, "[w]hen the charge is reviewed in its entirety, it is obvious that the [trial] court had more than adequately explained the meaning of restraint . . . ." (Internal quotation marks omitted.) Id.

In support of its discussion of *Foster*, the majority cites three Appellate Court cases. See footnote 28 of the majority opinion. First, I note that these cases are not binding on this court. Furthermore, none of them engaged in a textual comparison of the intent requirements for unlawful restraint and kidnapping. In the first of these cases, *State* v. *Davis*, 13 Conn. App. 667, 539 A.2d 150 (1988), the Appellate Court stated, with no analysis at all, that unlawful restraint requires specific intent. Id., 672. In *State* v. *Phu Dinh Le*, 17 Conn. App. 339, 552 A.2d 448 (1989), the court relied on the flawed conclusion in *State* v. *Shaw*, 186 Conn. 45, 53, 438 A.2d 872 (1982); see footnote 4 of this opinion; and on the summary statement in *Davis*. See *State* v. *Phu Dinh Le*, supra, 343. Finally, in *State* v. *Youngs*, 97 Conn. App. 348, 904 A.2d 1240, cert. denied, 280 Conn. 930, 909 A.2d 959 (2006), the court also relied on *Davis* and offered no more meaningful analysis of its conclusion that unlawful restraint is a specific intent crime. See id., 363–65. Moreover, although the court in *Youngs* categorized unlawful restraint as a specific intent crime, that court stated that the specific intent required is the intent to restrain the victim, and not, as the majority suggests, the intent to interfere substantially with the victim's liberty. See id.

unlawful restraint is a general intent crime. General Statutes § 53a-92 (a) defines kidnapping in the first degree and provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he *restrains* the person abducted *with intent to* (A) inflict physical injury upon him or violate or abuse him sexually . . . ." (Emphasis added.) Thus, to be guilty of kidnapping in the first degree, the state must prove that the defendant intentionally and unlawfully restricted the victim's movements to such a degree as to interfere substantially with her liberty (i.e., restraint), *with intent* to prevent her liberation by use or threat of physical force or intimidation (i.e., abduction), *and with intent* to inflict physical injury or abuse her sexually. See General Statutes §§ 53a-91 and 53a-92 (a) (2) (A). In contrast to the language that the legislature employs to provide the specific intent that must be *added* to a restraint to constitute kidnapping, the unlawful restraint statutes employ no similar language and specify no similar additional intent. See generally General Statutes §§ 53a-95 and 53a-96. Rather, these provisions simply state that "[a] person is guilty of unlawful restraint" when he *restrains* another person. General Statutes §§ 53a-95 and 53a-96.

Identification of the different intent requirements for kidnapping and unlawful restraint is important for several reasons. First, it explains the legislature's different classification of the two crimes because kidnapping requires a greater criminal intent. Second, once kidnapping is distinguished as a specific intent crime, the potential defenses available to a defendant charged with the more serious crime of kidnapping are broader than those available to a defendant charged with unlawful restraint.[8] Finally, this construction is consistent with

[8] This court has recognized that the defense of voluntary intoxication is available to negate the mental state required to commit specific intent crimes but not available to negate the mental state required for general intent

our case law, which repeatedly has identified that a kidnapping conviction requires proof that the defendant possessed the necessary intent.

Not only does the preceding analysis clarify the distinction between unlawful restraint and kidnapping, it also confirms that the analysis we have always conducted when a defendant is charged with kidnapping and an underlying assault-type crime is proper. The question for the jury is not whether the restraint was incidental to the commission of some underlying crime but whether the state has proved beyond a reasonable doubt that the confinement or movement of the victim was accomplished "with the requisite intent" to constitute the crime of kidnapping. *State* v. *Luurtsema*, supra, 262 Conn. 201; accord *State* v. *Amarillo*, 198 Conn. 285, 305, 503 A.2d 146 (1986); see also *State* v. *Bell*, supra, 188 Conn. 416. Therefore, in circumstances like those in the present case, in which the defendant's conduct may warrant a kidnapping charge and an additional charge, the state must prove beyond a reasonable doubt that the defendant possessed *both* the requisite intent to commit the underlying crime *and* the specific intent necessary for kidnapping to support a conviction on both charges.

It is the proper role of the jury to make such determinations. The burden is on the state to present evidence to support its contention that the defendant possessed both intents, even if he did so simultaneously. As our long history of case law dealing with this issue illustrates, there will be factual circumstances that make it especially difficult for a jury to identify whether a defendant acted with a singular purpose or multiple

crimes. E.g., *State* v. *Shine*, 193 Conn. 632, 638, 479 A.2d 218 (1984). Similarly, the defense of mistake of fact can be raised only to negate the mental state required to commit specific intent crimes. *State* v. *Smith*, 210 Conn. 132, 139, 142, 554 A.2d 713 (1989).

criminal objectives. Nevertheless, it is the jury's function, not this court's, to meet that challenge. "It offends neither logic nor reason that a particular fact may give rise to contradictory inferences. The inference ultimately drawn by the jury need not be the only rational inference possible. Our law confides to the jury the difficult task of deciding among often conflicting inferences which logically and reasonably may flow from the same basic fact. In its consideration of the evidence the jury must rely on its common sense, experience and knowledge of human nature in drawing inferences and reaching conclusions of fact." *State* v. *Rodgers*, 198 Conn. 53, 59, 502 A.2d 360 (1985).

When a defendant's actions give rise to multiple criminal charges, it is especially important that the jury understand the requisite intent that the state must prove beyond a reasonable doubt for *each separate* crime. The majority expresses concern that our existing interpretation of the kidnapping statutes has "encouraged [prosecutors] . . . to include a kidnapping charge in any case involving a sexual assault or robbery." The majority then attempts to devise a means by which a jury must determine whether the act of restraining was "incidental" to the commission of the other crime or whether it was "independent" and "significant enough" to constitute the separate crime of kidnapping. (Internal quotation marks omitted.) This new standard ignores the statutory language that clearly requires specific intent for the commission of a kidnapping and instead focuses on the conduct or actions of the defendant. I would address the majority's concerns differently and focus not on the defendant's *actions* but, as the statute dictates, on the defendant's *intent.*

The jury must consider all of the evidence and be instructed that it may infer intent from the conduct of

the defendant.[9] The majority identifies considerations that it deems relevant to a jury's determination of whether a restraint is incidental to some other crime. I would suggest that such factors are of greater relevance to a jury's determination of whether the defendant has acted with the specific intent necessary to support a kidnapping conviction. The jury must be instructed to consider all attendant circumstances. For example, evidence of any words spoken by the defendant to the victim or victims that may indicate his mental state, the manner in which the defendant accomplished the restraint of the victim, the actions that the defendant took prior to, during and following the restraint, the nature and duration of the victim's movement or confinement, whether the restraint occurred during the commission of a separate offense, whether the restraint reduced the defendant's risk of being caught, and whether the restraint occurred under circumstances that prevented discovery of the victim all will assist a jury's determination and shed light on the inner workings of the defendant's state of mind.

[9] For example, the trial court should instruct that "[a]s defined by our statute, a person acts intentionally with respect to conduct when his conscious objective is to engage in such conduct.

"What a person's purpose or intention has been usually is a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain purpose or intention. The only way in which a jury can ordinarily determine what a person's purpose or intention was at any given time, aside from that person's own statements, is by determining what that person's conduct was and what the circumstances were surrounding that conduct, and from that, infer what his purpose or intention was.

"This inference is not a necessary one; that is, that you are not required to infer intent from the accused's conduct, but it is an inference that you may draw if you find that it is reasonable and logical and in accordance with [the court's] instructions on circumstantial evidence. . . .

"[T]he burden of proving intent beyond a reasonable doubt is on the state." (Internal quotation marks omitted.) State v. Respass, 256 Conn. 164, 183–84 n.16, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

Furthermore, when a defendant is charged with multiple crimes, trial courts must instruct the jury properly on both the specific intent required for kidnapping *and* the requisite intent for any other underlying crime. After instructing the jury on the elements of intent, the trial court also should specify the following: "If you find that the defendant restrained the victim, as I've previously defined that term, but do not find that this restraint amounted to an abduction because the defendant lacked the specific intent to prevent the victim's liberation by secreting or holding him in a place where he is not likely to be found, or by using or threatening to use physical force or intimidation, then you must find the defendant not guilty of the charge of kidnapping. The intent for kidnapping *is different from* the intent to commit [the separate assault-type crime]. To find the defendant guilty of both charges, you must find not only that the state has proven beyond a reasonable doubt that the defendant engaged in the *conduct* constituting each crime but also that the defendant acted with the requisite *intent* for each crime."

## II

Section 53a-91, as I previously described, is clear and unambiguous on its face. The claimed ambiguity on which the majority relies to engage in its extratextual investigation is premised on the majority's flawed reading of that statute. It is, therefore, incumbent upon me to address the errors that the majority commits in this investigation, the violence that the majority's ultimate conclusions do to our principles of stare decisis and the problems created by its new rules regarding our kidnapping statutes.

## A

As a result of its extratextual investigation into the "historical backdrop" surrounding the enactment of our revised penal code, the majority determines that the

legislature "intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim." My primary disagreement with this determination is that it focuses improperly on the *action* of restraint in the crime of kidnapping rather than on the *intent* requirement. Additionally, the evidence on which the majority rests its ultimate determination is incomplete. First, the majority correctly observes that the commission to revise the criminal statutes (commission) intended its revisions of the kidnapping and unlawful restraint provisions to draw a distinction between restraints and abductions. The majority fails to recognize, however, that the commission accomplished this goal through its adoption of the differing mental states necessary for commission of the two crimes. The commission itself articulated the essence of this distinction: "Restraining, as defined, involves non-consensual restriction or interference with physical liberty. Abduction involves restricting *plus intent* to secrete the victim or the threat to use or the use of physical force or intimidation." (Emphasis added.) Commission to Revise the Criminal Statutes, supra, § 53a-91, p. 30.

Additionally, the majority relies on the fact that the commission noted that it "drew generally from comparable provisions of New York's Revised Penal Law and the Model Penal Code" and on the reform of kidnapping statutes starting with the New York Court of Appeals' decision in *People* v. *Levy*, 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793, cert. denied, 381 U.S. 938, 85 S. Ct. 1770, 14 L. Ed. 2d 701 (1965).[10] The majority is correct

---

[10] Notably, this court repeatedly and expressly has rejected arguments based on the reasoning in *Levy* as early as its initial construction of § 53a-91 et seq. See, e.g., *State* v. *Amarillo*, supra, 198 Conn. 304 & n.12; *State* v. *Chetcuti*, 173 Conn. 165, 170–71, 377 A.2d 263 (1977).

that the revised penal code adopted in Connecticut parallels the structural format of the New York Penal Law on kidnapping and unlawful imprisonment. The majority neglects to highlight, however, the three relevant and significant substantive changes that the Connecticut legislature made to the New York model before enacting our code. First, New York defines "restrain" differently. New York's definition of restraint includes a provision that "without consent" can mean restriction accomplished by "physical force, intimidation or deception . . . ."[11] N.Y. Penal Law § 135.00 (1) (a) (McKinney 2004). In contrast, Connecticut omits from its definition of "restraint" any mention of physical force or intimidation. See generally General Statutes § 53a-91 (1). Second, New York defines "abduct" differently. New York's definition requires that the defendant "restrain a person with intent to prevent his liberation by . . . (b) using or threatening to use *deadly physical force*."[12] (Emphasis added.) N.Y. Penal Law § 135.00 (2) (McKinney 2004). Conversely, the definition of "abduct" in § 53a-91 (2) contains no "deadly force requirement" but, instead, uses more inclusive language that more closely resembles that which New York employed in defining

[11] New York Penal Law § 135.00 (1) provides: " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences *or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful. A person is so moved or confined 'without consent' when such is accomplished by* (a) *physical force, intimidation or deception,* or (b) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement." (Emphasis added.) N.Y. Penal Law § 135.00 (1) (McKinney 2004).

[12] New York Penal Law § 135.00 (2) provides: " 'Abduct' means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use *deadly physical force*." (Emphasis added.) N.Y. Penal Law § 135.00 (2) (McKinney 2004).

"restrain." See General Statutes § 53a-91 (2) (" '[a]bduct means to restrain a person with intent to prevent his liberation by . . . using or threatening to use physical force or intimidation"). Finally, New York's statute defining kidnapping in the first degree includes a temporal requirement.[13] See N.Y. Penal Law § 135.25 (McKinney 2004) (person is guilty of kidnapping in first degree when, under circumstances not involving demand for ransom, he abducts another person, restrains that other person for more than twelve hours and possesses specific intent to do further harm). Connecticut's statutory scheme does not express any minimum period of confinement. See generally General Statutes § 53a-92. I suggest that these differences are vital to interpreting the statutory scheme ultimately adopted by the Connecticut legislature and demonstrate that the New York Penal Law served only as a guide. Moreover, the changes that our legislature made to the New York model support this court's existing construction of our kidnapping statutes, which rejects a time or distance requirement for restraint and relies on proof of the requisite specific intent to establish a defendant's guilt.

B

The majority's opinion is premised not only on its flawed statutory analysis but also on ignoring the

---

[13] New York Penal Law § 135.25 provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and when:

"1. His intent is to compel a third person to pay or deliver money or property as ransom, or to engage in other particular conduct, or to refrain from engaging in particular conduct; or

"2. He restrains the person abducted *for a period of more than twelve hours* with intent to:

"(a) Inflict physical injury upon him or violate or abuse him sexually; or

"(b) Accomplish or advance the commission of a felony; or

"(c) Terrorize him or a third person; or

"(d) Interfere with the performance of a governmental or political function . . . . " (Emphasis added.) N.Y. Penal Law § 135.25 (McKinney 2004).

important dictates of stare decisis and the legislative acquiescence doctrine. The majority correctly acknowledges that the principle of stare decisis is especially strong in circumstances, such as those in the present case, involving statutory construction. See, e.g., *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494–95, 923 A.2d 657 (2007). With today's decision, the court strays far afield of this important principle.

Our case law identifies several indicators that support the conclusion that legislative inaction should be viewed as affirmation of our court's statutory construction. The first indicator is the length of time that has passed since the court's announcement of its interpretation and during which the legislature has remained silent. See, e.g., id., 502 (legislature's failure to act in eighteen years since court first interpreted statute "highly significant"); *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 873–74, 792 A.2d 774 (2002) (rejecting argument regardless of its merits because court constrained by more than sixteen years of legislative silence); *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 252, 756 A.2d 1264 (2000) (six years of legislative silence indicative of legislature's affirmation). The second factor is the number of opportunities that this court has had to reconsider its initial statutory interpretation and to decide whether to abide by it. See *Hummel* v. *Marten Transport, Ltd.*, supra, 282 Conn. 491–95 (court's repeated affirmation of its initial interpretation followed by legislative silence persuasive); see also *Mahon* v. *B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 665, 935 A.2d 1004 (2007) ("[i]n light of . . . long interpretive history, [party] has a heavy burden of demonstrating why we should not treat the legislative silence in response to our construction of [a statute] as legislative approval of that construction"). But cf. *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 198–202, 708 A.2d 1371 (1998) (inconsistent

interpretive history by court weighed in favor of overruling one case's view of statute despite legislative inaction). The third factor is that the court should consider the existence of any evidence that the issue of the statute's construction has been presented to the legislature or addressed at all by its members, that is, whether there has been an actual opportunity to affirm or correct. See *Hummel* v. *Marten Transport, Ltd.*, supra, 495 (since court's decisions, legislature enacted comprehensive reform to statutory scheme but "only [e]ffected a nonsubstantive change to [statute]"); *Hammond* v. *Commissioner of Correction*, supra, 874 (legislature's acquiescence "especially strong" in wake of prior case in which concurrence "expressly urged" legislature to reexamine statute); *Rivera* v. *Commissioner of Correction*, supra, 252 (legislature amended statutory provision since court's decision without addressing court's construction).

This court was first called on to interpret § 53a-91 et seq. in 1977. See *State* v. *Chetcuti*, 173 Conn. 165, 377 A.2d 263 (1977). In *Chetcuti*, we concluded that "[t]he language of the statutes is clear . . . ." Id., 168. Furthermore, we expressly rejected the approach that the majority takes in the present case, namely, that when "the abduction and restraint of a victim *are merely incidental* to some other underlying offense, such as sexual assault, the abduction and restraint cannot form the basis for a verdict of guilty on a charge of kidnapping." (Emphasis added.) Id., 170. We also recognized the "merger effect" that this incidental rule would create if adopted and announced that "the legislature of this state has seen fit not to merge the offense of kidnapping with sexual assault or with any other felony. Nor has the legislature imposed any time requirement for the restraint, nor any distance requirement for the asportation to constitute the crime of kidnapping." Id. This conclusion has been consistently affirmed by this court and nearly always by a unanimous decision. See, e.g., *State* v. *Luurtsema*, supra, 262 Conn. 201–203; *State*

v. *Wilcox*, 254 Conn. 441, 465–66, 758 A.2d 824 (2000); *State* v. *Amarillo*, supra, 198 Conn. 304–305; *State* v. *Vass*, supra, 191 Conn. 614–15; *State* v. *Bell*, supra, 188 Conn. 416–17. Moreover, the legislature has remained silent throughout this time despite several opportunities to alter this court's construction of the statutory scheme.[14] The presence of all of these recognized considerations indicates that this court should infer legislative affirmation from that body's inaction. The majority elects to view my position with respect to legislative acquiescence as an absolute bar to reconsideration of prior statutory interpretation. My position is not at all that extreme. When one contemplates the factors that our precedent requires us to consider in determining whether to deem legislative inaction affirmation and the history of our case law with respect to our kidnapping statutes, however, I cannot see "how [this court] reasonably could decline to follow that rule today, if it is to retain any force at all."[15] *Hummel* v. *Marten Transport, Ltd.*, supra, 282 Conn. 502.

[11] There is evidence that the legislature is aware of this court's long-standing statutory construction and has declined opportunities to amend the relevant portions of the statutes since 1977. For example, although the majority quickly dismisses a 1993 amendment to § 53a-94, our case law suggests that the legislature's action with respect to this provision and the failure to alter the court's previous construction is significant evidence of affirmation. See *Hummel* v. *Marten Transport, Ltd.*, supra, 282 Conn. 495; *Rivera* v. *Commissioner of Correction*, supra, 254 Conn. 252. Additionally, following our decision in *Luurtsema*, the judiciary committee considered three bills addressing the elements of the charge of kidnapping. An Act Concerning Asportation in Kidnapping Cases, Raised Bill No. 1284, 2005 Sess.; An Act Concerning Asportation in Kidnapping Cases, Senate Bill No. 530, 2005 Sess.; An Act Concerning Asportation in Kidnapping Cases, Raised Bill No. 1159, 2003 Sess. None received favorable committee action.

[15] In spite of these substantial persuasions, the majority observes, with respect to the legislative acquiescence doctrine, that this court also has "recognized that legislative inaction [following our interpretation of a statute] is not necessarily legislative affirmation . . . ." (Internal quotation marks omitted.) I note, however, that none of the cases on which the majority relies supports deviation, *in this case*, from the weight of our case law, which accepts the legislature's silence as assent. "Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute." (Internal quotation marks omitted.) *Rivera* v. *Commissioner of Correction*, supra,

In addition to its general observation that legislative acquiescence has not always been deemed affirmation, the majority articulates six reasons to justify its decision to overrule our long-standing precedent. The ideas that the majority expresses and cases that it cites in support of these reasons, however, are all distinguishable from the present case. Further, I do not agree that these six rationales rise to the level of substantial injustice or

254 Conn. 252; accord *Mahon* v. *B.V. Unitron Mfg., Inc.*, supra, 284 Conn. 665; *Hummel* v. *Marten Transport, Ltd.*, supra, 282 Conn. 494; *Conway* v. *Wilton*, 238 Conn. 653, 682, 680 A.2d 242 (1996).

For example, the majority relies on *State* v. *Colon*, 257 Conn. 587, 778 A.2d 875 (2001), for the proposition that "legislative inaction is not always the best of guides to legislative intent." (Internal quotation marks omitted.) The court in *Colon* cited a single case in support of this observation, namely, *Streitweiser* v. *Middlesex Mutual Assurance Co.*, 219 Conn. 371, 379, 593 A.2d 498 (1991). See *State* v. *Colon*, supra, 598 n.14. *Streitweiser* is far from a classic example, however, of this court's consideration of whether legislative inaction amounts to affirmation. In *Streitweiser*, the court was faced with two inconsistent lines of cases, in response to which the court observed that, "[b]ecause these diverse holdings look in different directions, the legislature cannot logically have acquiesced in them all." *Streitweiser* v. *Middlesex Mutual Assurance Co.*, supra, 379. No such inconsistency exists in the present case. Notwithstanding this important distinction in *Streitweiser*, *Colon* itself is distinguishable. In that case, we did not announce a reconstruction of § 53a-48 or overrule the case in which it was first construed, namely, *State* v. *Grullon*, 212 Conn. 195, 562 A.2d 481 (1989). See *State* v. *Colon*, supra, 598–600. Rather, the court overruled a subsequent case, *State* v. *Robinson*, 213 Conn. 243, 567 A.2d 1173 (1989), not because its interpretation of § 53a-48 as a bilateral conspiracy statute was clearly erroneous or resulted in injustice but because it concluded that its reliance on *Grullon* in *Robinson* was improper. See *State* v. *Colon*, supra, 598–601.

The other cases on which the majority relies for its observation that legislative silence is not always affirmation are likewise distinguishable from the reconsideration of the statutory scheme at issue in the present case. See, e.g., *State* v. *Skakel*, 276 Conn. 633, 692, 888 A.2d 985 (broad pronouncement of common-law rule beyond mere statutory construction "tempers . . . traditional reluctance to upset the settled interpretation of a particular statute"), cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); *State* v. *Miranda*, 274 Conn. 727, 734, 878 A.2d 1118 (2005) (court corrected "clearly wrong" statutory interpretation only three years old); *Waterbury* v. *Washington*, 260 Conn. 506, 539–45, 800 A.2d 1102 (2002) (*first* interpretation of specific statutory provision and reexamination of earlier constructions due to court's failure to have considered entirety of statutory scheme); *Ferrigno* v. *Cromwell Development Associates*, supra, 244 Conn. 198–202 (correction of court's inconsistent interpretations of same statute over time).

clear error, which our cases require to overrule an existing statutory construction.[16]

The majority acknowledges our role as the legislature's surrogate when we first construe that body's

[16] First, the majority asserts that "[t]he arguments for adherence to precedent are least compelling . . . when the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants . . . ." (Internal quotation marks omitted.) Majority opinion, p. 523, quoting *Craig* v. *Driscoll*, 262 Conn. 312, 330, 813 A.2d 1003 (2003). None of our prior cases that cite this quote by former United States Supreme Court Justice Benjamin N. Cardozo; see B. Cardozo, The Nature of the Judicial Process (1921) p. 151; discussed overruling the existing construction of a criminal statute. See *Craig* v. *Driscoll*, supra, 330 (deciding whether to recognize common-law action against purveyor that negligently served alcohol to adult patron who, because of intoxication, injured third person, and noting fact that parties were unlikely to consider question of what law would govern their conduct if it were to result in injury); *George* v. *Ericson*, 250 Conn. 312, 317–18, 736 A.2d 889 (1999) (overruling common-law rule of evidence excluding testimony of nontreating physicians and replacing it with standard governing testimony of expert witnesses in general); *Conway* v. *Wilton*, 238 Conn. 653, 661, 680 A.2d 242 (1996) (reinterpretation of statute governing tort liability); *O'Connor* v. *O'Connor*, 201 Conn. 632, 644, 648, 519 A.2d 13 (1986) (rejection of lex loci doctrine in tort actions).

Furthermore, when Justice Cardozo's statement is viewed in the larger context of his chapter entitled, "Adherence to Precedent," it does not support the majority's suggestion that criminal actors are like those who engage in tortious conduct and rarely give thought to what law will govern their criminal behavior. Instead, Justice Cardozo was observing the possibility that, over time, "the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly . . . ." B. Cardozo, supra, p. 151. I fail to see the relevance of this observation to the majority's decision.

Second, the majority suggests that "the issue presented by the defendant's claim is not one that is likely to have reached the top of the legislative agenda . . . ." I note that the majority cites no authority in support of its claims that the legislature is unlikely to act "because the issue directly implicates only a relatively narrow category of criminal cases . . . it is uncertain whether the position that the defendant advocates would attract interested sponsors with access to the legislature . . . [and] it . . . is unclear whether the issue is sufficiently important to gain their full support." I can only garner from these observations that the majority has apparently concluded that the legislature would require the influence of lobbyists and the potential for political advantage in order to rectify an erroneous statutory construction by this court. Additionally, I am puzzled by the majority's assumption that the application of our kidnapping statutes is of little interest to the legislature in light of the committee activity addressing it in the past few years. See footnote 14 of this opinion.

Third, the majority concludes that "this court never has undertaken an extensive analysis of whether our kidnapping statutes warrant the broad

intent in enacting a statute. It fails, however, to recognize the end of that surrogacy once we have construed the legislature's intent and an appropriate time has

construction that we have given them." As I stated previously in this opinion, I agree with the majority that in-depth textual analysis is lacking in our prior written decisions.

Fourth, the majority claims that a "reason to reconsider our prior holdings construing the kidnapping statutes to encompass virtually all sexual assaults and robberies is that all of our prior cases have relied on a literal application of the language of our kidnapping statutes." Although the majority concedes that this court "frequently adhere[s] to the literal language of a statute," it proceeds to rely on four cases to exemplify situations in which we eschewed the literal language of a statute because it led to bizarre or unworkable results. I note that none of the four cases to which the majority refers implicated stare decisis or our legislative acquiescence doctrine. Moreover, the cases involved circumstances that are distinguishable from the application of our kidnapping statutes in the present case. See *Clark* v. *Commissioner of Correction*, 281 Conn. 380, 390–91, 401, 917 A.2d 1 (2007) (rejecting literal construction because statutory scheme conflicted on its face); *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 404–405, 780 A.2d 903 (2001) (in construing statute for first time, court rejected literal reading that would impliedly overrule existing case law that legislature did not express intent to overrule); *Levey Miller Maretz* v. *595 Corporate Circle*, 258 Conn. 121, 132–33, 780 A.2d 43 (2001) (rejecting literal construction of statute when legislature expressly communicated that it did not intend provision to be narrowly construed); *State* v. *Brown*, 242 Conn. 389, 402–406, 699 A.2d 943 (1997) (literal construction of statute would have been practically unworkable as it would have required trial to commence regardless of whether defendant's attorney was available).

Fifth, the majority suggests that "the legislative acquiescence doctrine requires actual acquiescence on the part of the legislature"; (internal quotation marks omitted); and cites to a footnote in *Berkley* v. *Gavin*, 253 Conn. 761, 756 A.2d 248 (2000), for this proposition. See id., 776–77 n.11. I note, however, the lack of any authority for this general proposition announced in *Berkley*. Nevertheless, as I already have discussed, with respect to the kidnapping statutes, there has been *actual* acquiescence. In 1993, subsection (b) of the same statute under which the defendant in the present case was charged was amended and, yet, no change was made with respect to a minimum requirement for the length of confinement or asportation. See Public Acts 1993, No. 93-148, § 1. It is significant that the legislature amended the statute sixteen years after our interpretation was first announced and after consistent rulings by this court, and chose not to amend the pertinent definitional sections. See footnote 14 of this opinion. If this is not evidence of acquiescence, I am hard pressed to know where else to look. The majority appears to suggest that, because the legislature did not correct our construction of the kidnapping statutes, there was no acquiescence.

Sixth, the majority observes that, "since 1977, when this court first rejected a claim that a kidnapping conviction could not be based on conduct involving a restraint that is merely incidental to the commission of another crime, the courts of many other states have reached a contrary conclusion in

passed without action to correct that construction. This court should honor the "significant jurisprudential limitation" imposed on us by the legislative acquiescence doctrine; (internal quotation marks omitted) *Hammond* v. *Commissioner of Correction*, supra, 259 Conn. 874; and recognize that "legislatures and not courts are responsible for defining criminal activity." *State* v. *Skakel*, 276 Conn. 633, 675, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

C

The majority announces its new construction of the crime of kidnapping and explains that, going forward, "in order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement. When that confinement or movement is merely incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime." This conclusion is not supported by the language of the statutes or by our prior construction expressly rejecting such a rule. In rejecting our existing jurisprudence, the majority not only steps into the shoes of the legislature but also effectively divests prosecutors of the charging discretion that they currently possess with respect to the crimes of kidnapping and unlawful restraint. In doing so, it accomplishes that which was best articulated by Justice Borden in his concurring opinion in *Luurtsema*: "It would be appealing to decide . . . that in a given case the degree of

interpreting their kidnapping statutes." The majority later characterizes these courts' actions as "follow[ing] the lead of New York and California . . . ." Significantly, one commentator has suggested of New York's highest court: "The *Levy* majority usurped the power of the New York legislature. In effect, the court by judicial interpretation wrote a new kidnapping statute for New York." F. Parker, "Aspects of Merger in the Law of Kidnapping," 55 Cornell L. Rev. 527, 537 (1970). I agree that evidence of a trend in other jurisdictions may indicate that a change in our kidnapping laws would be prudent or advisable, but the adoption of such changes is for the legislature, not this court.

movement or time of forcible restraint is too de [minimis] to constitute kidnapping. The fact that it may be counterintuitive *to me*, however, is not sufficient . . . .

"[W]e have implicitly rejected any notion that a slight degree of asportation or detention could create a jury question regarding whether kidnapping was merely 'incidental' to the underlying crime also committed by [a] defendant. . . . *It would be contrary to the legislative scheme for us to reenter that fray . . . and would amount to micromanaging what is essentially a charging decision by the state* . . . ." (Citations omitted; emphasis added.) *State* v. *Luurtsema*, supra, 262 Conn. 204–205 (*Borden, J.*, concurring).

I begin with the majority's intrusion on our state's attorneys. The majority correctly acknowledges our well settled law that, "an accused may be charged with and convicted of more than one crime arising out of the same act or acts, as long as all of the elements of each crime are proven." With today's decision, the majority ignores the equally well settled principle that when "criminal statutes overlap, the state is entitled to choose from among them as long as its action does not discriminate against any class of defendants. . . . We have always held that prosecutors have broad discretion in determining what crime or crimes to charge in any particular situation. . . . Moreover, where the elements of two or more distinct offenses are combined in the same act, prosecution for one will not bar prosecution for the other." (Citations omitted.) *State* v. *Chetcuti*, supra, 173 Conn. 168–69. The majority claims, in the absence of any supporting authority, that our existing interpretation of the kidnapping statute has afforded prosecutors with "unbridled discretion" and "encouraged them . . . to include a kidnapping charge in any case involving a sexual assault or robbery." I am puzzled by this statement, which encompasses a general criticism of prosecutors' charging decisions in this

realm, because footnote 23 of the majority opinion indicates that prosecutors seem to exercise this discretion often in the defendants' favor. As the majority suggests, there seem to be many prosecutions for the less serious crime of unlawful restraint arising from factual circumstances that could support the more serious kidnapping charge. See footnote 23 of the majority opinion. Although we have held that prosecutorial discretion is not without oversight, we also have noted that "the basis of prosecutorial charging decisions is one area not generally well suited for broad judicial oversight because it involve[s] exercises of judgment and discretion that are often difficult to articulate in a manner suitable for judicial evaluation." (Internal quotation marks omitted.) *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 575, 663 A.2d 317 (1995). We have authorized the exercise of such oversight in response to a claim of discrimination. See id., 576–77. This defendant raises no such claim, and I am not aware of any prior claims of discriminatory charging practices with respect to the crime of kidnapping.

The statutory scheme does not mandate that all restraints committed with the intent necessary to abduct be prosecuted as kidnappings. I recognize, as does our case law, that there is an area of overlap between the crime of unlawful restraint in the first degree, which requires restraint of the victim "under circumstances which expose [the victim] to a substantial risk of physical injury"; General Statutes § 53a-95; and of the crime of kidnapping. It may be possible to "restrain" a person under circumstances that expose such person to a substantial risk of physical injury when that risk is created by the perpetrator's intent to use physical force. See *State* v. *Jordan*, 64 Conn. App. 143, 148, 781 A.2d 310 (2001) ("jury finding of actual physical injury encompasses the statutory requirement of mere exposure to physical injury"). As this court recognized

in *State* v. *Palmer*, 206 Conn. 40, 536 A.2d 936 (1988), however, this overlap does not diminish the fact that the two crimes have different elements. See id., 53–54 (rejecting claim that conviction of kidnapping and unlawful restraint in first degree violates double jeopardy principles). Specifically, kidnapping requires additional proof of the particular criminal intent necessary to establish abduction. See, e.g., *State* v. *Luurtsema*, supra, 262 Conn. 201 (including "use of physical force" in statement of requisite intent for kidnapping); *State* v. *Vass*, supra, 191 Conn. 618 ("use of force, threat of force of intimidation" sufficient to satisfy requisite intent for crime of kidnapping); *State* v. *Bell*, supra, 188 Conn. 415–16 (same); see also Commission to Revise the Criminal Statutes, supra, § 53a-91, p. 30 (noting abduction involves restraint *plus intent* to secrete victim or to threaten or use physical force).

The majority fails to recognize that merely because there are factual circumstances that *could* give rise to a prosecution for kidnapping does not mean that they *must*. Our case law has recognized that, under certain factual circumstances, unlawful restraint in the first degree may constitute a lesser included offense of the crime of kidnapping in the first or second degree. See *State* v. *Vass*, supra, 191 Conn. 618; see also *State* v. *Daugaard*, 231 Conn. 195, 196 n.1, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995). But see *State* v. *Palmer*, supra, 206 Conn. 53–54 (concluding, for purposes of double jeopardy analysis, that defendant could have committed crime of kidnapping in first degree without first having committed purportedly lesser included offense of unlawful restraint in first degree). Thus, a particular defendant charged with kidnapping may be entitled to a jury charge on unlawful restraint.[17]

---

[17] To be so entitled, the defendant would have to satisfy the four-pronged test laid out by this court in *State* v. *Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980). "A defendant is entitled to an instruction on a lesser offense if, and only if . . . (1) an appropriate instruction is requested by either the

The majority not only invades the purview of our state's attorneys, but its new construction of the statutory scheme ignores the fact that "[t]he [state] constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment . . . ." *State* v. *Darden*, 171 Conn. 677, 679–80, 372 A.2d 99 (1976). "Prescribing punishments for crimes clearly fits into this category and is therefore a function of the legislature." *State* v. *Morrison*, 39 Conn. App. 632, 634, 665 A.2d 1372, cert. denied, 235 Conn. 939, 668 A.2d 376 (1995). Reading the majority opinion in its entirety reveals that the crux of its concern is really the severity of punishment authorized under the kidnapping statutes in light of the scope of potential conduct governed by it. The majority appears to overlook the fact that defining crimes is the responsibility of our legislature. Moreover, this concern regarding overbreadth is predicated on studying the defendant's *conduct*. As I previously noted, however, the focus should be on the defendant's *specific intent* and not on his conduct.[18] The majority's misguided focus leads

state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." (Internal quotation marks omitted.) *State* v. *Vass*, supra, 191 Conn. 616–17.

"The [defendant in *Vass* could not prevail on his claim] that he was entitled to a charge of unlawful restraint . . . . Although its definition, restraint of another person, does fall within the ambit of the crime of kidnapping, the defendant . . . failed to satisfy the fourth prong of the *Whistnant* test. He . . . failed to demonstrate that the crucial element of intent, which differentiates kidnapping from unlawful restraint in the second degree, was sufficiently in dispute to justify an instruction on the lesser charge. The defendant offered no evidence . . . that would tend to suggest that whoever perpetrated the crime restrained the victim without the requisite intent to prevent her liberation by the use of force, threat of force or intimidation." (Citation omitted.) Id., 618.

[18] The majority describes our prior construction of the kidnapping statutes as "overly broad" and proposes that juries now must determine whether a defendant's restraint of the victim is incidental to the commission of a

to·the illogical conclusion that a defendant's conviction of kidnapping is improper when the restraint was incidental to the commission of an underlying crime but that a defendant's conviction of both unlawful restraint and the same underlying crime is not improper under the same circumstances. This position only makes sense if one considers the variation in the severity of punishment that results from a kidnapping conviction. That is, the majority does not seem to be bothered by the additional punishment for the class D felony, first degree unlawful restraint, but is bothered by the additional charge for the class B felony, second degree kidnapping. Although the majority concludes that the legislature intended a graded scheme of increasing severity of punishment for the restriction of an individual's liberty, which I do not refute, it offers no basis for its inconsistent conclusion that the legislature did not intend for defendants to be convicted of kidnapping when they perpetrate a restraint incidental to an assault-type crime but did intend for defendants to be convicted of unlawful restraint under the same circumstances. In the latter situation, the restraint necessary to commit the underlying crime and the restraint necessary to commit the crime of unlawful restraint are also the same. This conclusion divests prosecutors of their discretion to make charging decisions, ignores the clear language distinguishing the crimes of kidnapping and unlawful restraint by virtue of their respective intents, and diminishes the proper role of a jury to determine whether the state has proven all elements of the crimes charged beyond a reasonable doubt. See part I of this opinion; see also *State* v. *Cortes*, 276 Conn. 241, 247,

---

separate crime. I fail to see how this will provide a jury with clear guidance on how to make such a discerning judgment. Moreover, as noted in part I of this opinion, the factors that the majority suggests that a jury should consider are more properly indicators of whether the defendant possessed the mental state necessary to kidnap the victim rather than whether the defendant perpetrated a restraint of independent significance.

885 A.2d 153 (2005) (jury found defendant guilty of unlawful restraint but not guilty of kidnapping).

Another troubling aspect of the majority's decision is that it appears to result in the imposition of two separate standards for determining when a kidnapping has occurred. If a defendant has committed an assault-type crime, then the majority would have the state prove that the "confinement, movement, or detention . . . was significant enough, in and of itself, to warrant independent prosecution." (Internal quotation marks omitted.) In contrast, when a defendant abducts a victim with intent to commit an assault-type crime but cannot complete the assault-type crime, under the majority's construction, a kidnapping conviction would be justified regardless of the length of confinement or degree of movement. Under this paradigm, a defendant could be convicted of kidnapping when his victim suffered less actual physical injury than in a case in which the defendant accomplished the underlying assault and the act of kidnapping was merely incidental to that assault. I cannot see how this would in any way effectuate the statute as written or the legislature's intent to create a criminal code that is "rational, coherent, cohesive and intelligible . . . ." (Internal quotation marks omitted.)

Nevertheless, I agree with the result reached by the majority. In the present case, the trial court instructed the jury only on the general meaning of intent and omitted from its instructions on kidnapping the specific intent necessary for a conviction on that charge.[19] Furthermore, the trial court improperly defined "abduct"

---

[19] The trial court instructed the jury in relevant part: "Intent relates to the condition of mind [of one] who commits an act, his purpose in doing the act. As defined by statute, a person acts intentionally with respect to [a] result or conduct when the conscious objective is to engage in such conduct. . . .

"Nobody is able to look into another's mind and see a specific intent. The only way a jury can ordinarily determine what a person's purpose was or intent was other than from that person's own statements and testimony is by determining what the conduct was and what the circumstances were surrounding the conduct. . . ."

in its charge to the jury.[20] I agree with the defendant that these instructions were improper. Because the specific intent to prevent the victim's liberation by secreting her, or by using or threatening to use physical force or intimidation, is an essential element of the crime charged, such an omission constitutes reversible error. See, e.g., *State* v. *Tedesco*, 175 Conn. 279, 291–92, 397 A.2d 1352 (1978). Furthermore, I conclude that the trial court's definition of "abduct" had the potential to confuse the jury and did not adequately distinguish the crime of unlawful restraint in the first degree from that of kidnapping in the second degree.[21] Therefore, I concur in the result that the majority reaches, that is, that the defendant is entitled to the reversal of his conviction of kidnapping in the second degree and a new trial on that charge.

---

[20] The trial court instructed the jury in relevant part: "Abduct means to restrain a person by the use of physical force or the threatened use of physical force or by intimidation."

[21] Under the definitions set forth in § 53a-91, one may accomplish a restraint through many means, including the use of force. See General Statutes § 53a-91 (1). For example, a defendant may commit an unlawful restraint without ever possessing an intent to prevent the victim's liberation by using or threatening to use physical force. Such restraint could occur by confining the victim in a room using locks or other barriers, refusing to provide information on the location of an exit or, as the statute notes, by deception. A person may accomplish an abduction, however, only if he restrains the victim with the specific intent to prevent his liberation "by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2).